UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on November 3, 2016**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | **CRIMINAL NO.** |
| v. | : | |
| | : | **VIOLATIONS:** |
| **STANISLAV NAZAROV,** | : | **18 U.S.C. § 1956(h) (Conspiracy to** |
| **a.k.a., "SLAVA," and** | : | **Commit Money Laundering);** |
| **a.k.a., "SLAVIK,"** | : | **18 U.S.C. § 1956(a)(2)(A), (a)(3)(A)** |
| | : | **and (B) (Money Laundering);** |
| | : | **18 U.S.C. § 2 (Aiding and Abetting,** |
| | : | **Causing an Act to Be Done)** |
| | : | |
| | : | **FORFEITURE ALLEGATION:** |
| **Defendant.** | : | **18 U.S.C. § 982(a)(1), (a)(2);** |
| | : | **21 U.S.C. § 853(p) (Criminal Forfeiture)** |
| | : | : |
| | : | **UNDERSEAL** |

## INDICTMENT

The Grand Jury charges that:

At all times material to this Indictment:

### Introduction

1.      Defendant STANISLAV NAZAROV ("NAZAROV") was a resident of Israel.

2.      Persons A, B, and C were residents of Israel.

3.      Co-Conspirator 1 ("CC-1") was purportedly a resident of Russia.

4.      Company 1 was a reinsurance company owned by the Government of India and headquartered in Mumbai, India.

1

5.      Company 2 was a wholly-owned subsidiary of Company 1 and was located in Dubai, United Arab Emirates.

**NAZAROV's Partnership with W-1**

6.      Beginning in or around 2011 to in or around June 2015, Witness 1 ("W-1") served as a money launderer for various individuals and groups engaged in fraudulent schemes in Israel and elsewhere.   In that role, W-1 used his long-standing connections with others in Israel's money laundering community to obtain bank accounts needed by fraudsters to effectuate their criminal schemes.   As compensation for those efforts, W-1 received a portion of the proceeds from those fraudulent criminal schemes.

7.      In September 2013, an acquaintance of W-1 introduced W-1 to NAZAROV at a cigar shop in Ramat Gan, Israel.   During that initial meeting, NAZAROV provided W-1 with a bank account which W-1 then passed along to another fraudster.   When that fraudster used the bank account to successfully defraud a company, W-1 shared some of the fraud proceeds that W-1 obtained from the scheme with NAZAROV.   Following that successful fraud, W-1 and NAZAROV agreed to become partners and to share in the proceeds of fraudulent schemes going forward.

8.      As part of their criminal partnership, NAZAROV agreed to provide bank accounts to W-1 to use in W-1's money laundering activities.   In addition, NAZAROV agreed to use his connections and reputation in the criminal community in Israel to protect W-1 and diffuse any disagreements that arose between W-1 and other fraudsters.   In exchange, W-1 agreed to provide NAZAROV with half of the proceeds that W-1 made from any other fraudulent schemes in which W-1 became involved.

9.      From in or around September 2013 through in or around June 2015, the criminal partnership between NAZAROV and W-1 generated hundreds of thousands of dollars in proceeds from various fraudulent schemes.   They typically split their portion of the fraud proceeds 50/50.

## W-1's Wire Fraud Conspiracy with Persons A, B, and C

10.      In or around March 2015, W-1 conspired with three individuals in Israel to engage in a "cyber-phishing scheme."   These three individuals were Persons A, B, and C.   As part of their cyber-phishing scheme, Persons A, B, and C would create email addresses that mimicked the email addresses of a high-ranking official at a company.   The co-conspirators would then, through researching publicly available information, ascertain the name and email address of another employee at that company.   Then, posing as the high-ranking official, the co-conspirators would send emails to the employee, directing that employee to wire transfer large sums of money to bank accounts controlled by the co-conspirators.

11.      The fraudulent schemes of Persons A, B, and C were supported by members of the Hariri Crime Family, which is a known organized crime family in Israel.   The Hariri Crime Family settled disputes on behalf of Persons A, B, and C, much like NAZAROV did on W-1's behalf.

## The Cyber-Phishing Attack on Company 1 and Company 2

12.      Between on or about June 3, 2015, and on or about June 9, 2015, Persons A, B, and C engaged in a cyber-phishing scheme to defraud Company 2.   As part of that scheme to defraud, Persons A, B, and C sent email messages to the director of Company 2, which were created by Persons A, B, and C to appear as if the emails were being sent by the president of Company 1 and Company 1's outside counsel.   In those email messages, Persons A, B, and C led the director of

Company 2 to falsely believe it was being directed by the president of Company 1 to purchase shares of a United States-based company.

13.      As part of that scheme to defraud, Persons A, B, and C, using fraudulent emails to pose as the president of Company 1 and its outside counsel, caused the director of Company 2 to believe that the share purchase transaction was confidential and could not be discussed with anyone except for the president of Company 1 and its outside counsel.   As part of that scheme to defraud, Persons A, B, and C also caused the director of Company 2 to falsely believe that the total purchase price of the United States company's shares was $7,135,200.   Moreover, as part of that scheme to defraud, Persons A, B, and C caused the director of Company 2 to falsely believe that a down-payment of 20% of that purchase price (i.e., $1,427,040) had to be paid by Company 2 before that share purchase agreement could be executed.

14.      As part of that scheme to defraud, Persons A, B, and C solicited W-1 to obtain a bank account in the United States to receive the fraudulent wire transfer of approximately $1.4 million.   W-1 then contacted Witness 2 ("W-2"), who was in the United States, to obtain such a bank account.   W-2 then provided W-1 with a bank account at a bank in Washington, D.C., in the name of T.O. International Group LLC (Account No. XXXXXX9252).

15.      As part of that scheme to defraud, W-1 provided Account No. XXXXXX9252 to Persons A, B, and C.   Persons A, B, and C, posing as outside counsel to Company 1, then emailed that bank account number to the director of Company 2 and requested that the $1.4 million be wire-transferred into that account.

16.      On June 4, 2015, the director of Company 2, in reliance on the fraudulent emails sent by Persons A, B, and C, caused a wire transfer in the amount of $1.4 million to be sent from

4

Company 2's bank account in Dubai, United Arab Emirates, to Account No. XXXXXX9252, which was located in Washington, D.C.

17.     All of the email communications sent by Persons A, B, and C, which fraudulently induced the director of Company 2 to send the wire transfer of $1.4 million to the bank account in Washington, D.C., were transmitted using United States-based email accounts and, as a result, traversed the United States' wires.  Furthermore, the fraudulently-induced wire transfer of $1.4 million from Company 2 to Account No. XXXXXX9252 in Washington, D.C., traversed the United States' wires.

18.     In causing the fraudulent wire-transfer of money from Company 2 to Account No. XXXXXX9252 in Washington, D.C., and by using the United States' wires to defraud Company 2, Persons A, B, and C committed the Specified Unlawful Activity of Wire Fraud, in violation of Title 18, United States Code, Section 1343.

### Subsequent Communications Between W-1 and NAZAROV

19.     As part of their criminal partnership, on or about June 4, 2015, while both were in Israel, W-1 informed NAZAROV of the successful cyber-phishing attack on Company 2 by Persons A, B, and C, and the wire transfer of the $1.4 million to the bank account in the United States.

20.     On or about June 9, 2015, W-1 traveled from Israel to Washington, D.C., to meet with W-2 to determine how to distribute the $1.4 million from the bank account in Washington, D.C., to Persons A, B, and C, NAZAROV, and others known and unknown to the Grand Jury. While in Washington, D.C., W-1 was arrested and agreed to cooperate with the United States government.

21.     Between on or about June 16, 2015, through on or about November 16, 2015, at the direction of the United States government, W-1 engaged in numerous recorded conversations with NAZAROV, both telephonically and in-person in Israel, regarding W-1's payment of the $1.4 million to Persons A, B, C, NAZAROV, and others known and unknown to the Grand Jury.   In those conversations, NAZAROV requested that he be paid his share of the proceeds from the cyber-phishing attack on Company 2.   NAZAROV also explained the efforts he was undertaking, consistent with NAZAROV's agreement with W-1, to allay members of the Hariri Crime Family who were demanding payment of their share of the $1.4 million in fraud proceeds.   In addition, NAZAROV arranged a meeting between W-1 and at least one member of the Hariri Crime Family so W-1 could explain why W-1 had not yet obtained and distributed the $1.4 million to the co-conspirators.

22.     On or about December 2, 2016, at the direction of the United States government, W-1 engaged in multiple recorded conversations with NAZAROV, both telephonically and through a text messaging application, while W-1 was in Washington, D.C.   In those conversations, W-1 represented to NAZAROV that W-1 anticipated obtaining $50,000 in proceeds from "work" that W-1 expected to perform in the United States.   NAZAROV understood that the term "work," as used by W-1, signified fraudulent or otherwise criminal activity.   W-1 then asked NAZAROV whether NAZAROV wished to share in the proceeds from the anticipated "work" pursuant to their existing criminal partnership.   In response, NAZAROV stated that he was willing to accept his share of the criminal proceeds but first needed to find a bank account to receive those proceeds.

23.     In subsequent recorded conversations on or about December 2, 2016, NAZAROV told W-1 that NAZAROV could receive the anticipated $50,000 first in the Czech Republic and

then would transfer that money through Moscow, Russia, to his location in Israel.   NAZAROV then asked W-1 to create an email account where W-1 could receive the bank account number through which NAZAROV would receive the anticipated proceeds from the "work."   W-1 then created a United States-based email account and provided that email account address to NAZAROV.

24.   On or about December 5, 2016, W-1 received an email from a Russian email account in the United States-based email account W-1 had provided to NAZAROV.   That email included an attachment, which contained information for a Scottish company's bank account at a bank in the Czech Republic.

### NAZAROV's Money Laundering Conspiracy with CC-1 and Others

25.   On or about December 14, 2016, while in the District of Columbia and at the direction of the United States government, W-1 initiated a recorded telephone conversation with NAZAROV.   In that conversation, W-1 told NAZAROV that the anticipated "work" had fallen through and there would be no proceeds from that "work."   In that same conversation, W-1 also represented to NAZAROV that W-1 could instead wire-transfer $50,000 of the $1.4 million in proceeds from the cyber-phishing attack on Company 2 (referenced above in paragraphs 12 – 21) to NAZAROV.   NAZAROV therefore knew that the $1.4 million was derived from a wire fraud scheme perpetrated by Persons A, B, and C, and others.   On that call, NAZAROV asked if the money was "kosher," meaning, whether the unlawful nature of the money was sufficiently concealed such that it would not trigger any bank fraud alerts.   If it was not "kosher," NAZAROV stated that he would provide a telephone number for a "man in Moscow" who would provide W-1 with a bank account to receive the wire transfer and who would then transfer that money to NAZAROV in Israel.

26.     On that same day, NAZAROV spoke to W-1 in a recorded telephone call and informed W-1 that he would introduce W-1 to a Russian acquaintance who may be able to receive the wire transfer.   Later that day, NAZAROV sent text and voice messages to W-1 providing a phone number for an individual whom NAZAROV stated would assist W-1 in transferring the money.

27.     After receiving these messages from NAZAROV, W-1 called the number and spoke with an individual purportedly located in Moscow, Russia (hereinafter, "CC-1").   On that call, CC-1 explained to W-1 that CC-1 could receive the wire transfer of $50,000 from W-1, and could then transfer that money to NAZAROV.   CC-1 also explained to W-1 that the bank account that would be receiving the $50,000 wire transfer was in CC-1's wife's name, whom CC-1 claimed was not a Russian citizen and therefore nobody would "check" W-1's wire transfer.

28.     Following that call with CC-1, W-1 called NAZAROV and told NAZAROV that W-1 had spoken with CC-1 and that CC-1 would be receiving the wire transfer.   W-1 also informed NAZAROV that CC-1 would send NAZAROV a bank account to receive the $50,000 wire transfer and that, upon receiving that account information from CC-1, NAZAROV should forward that account information to W-1.

29.     W-1 then called CC-1.   W-1 told CC-1 to send the information for the bank account that would receive the $50,000 wire transfer directly to NAZAROV.   W-1 also told CC-1 that NAZAROV would then forward that account information to W-1.   CC-1 agreed and informed W-1 that the bank account information would be sent by CC-1 to NAZAROV the following morning.

30.     On December 16, 2016, W-1 received a text message from NAZAROV containing details for accounts at three banks: (1) a bank in New York City, New York; (2) a bank in Vienna,

Austria; and (3) a bank in Moscow, Russia.   W-1 then received a text message from CC-1 stating

that CC-1 just sent that bank account information to NAZAROV.   The text message from CC-1

also stated that W-1 should list the "reason of payment" for the wire transfer as being "financial

help."

31.   On December 19, 2016, the Federal Bureau of Investigation ("FBI") initiated a

wire transfer of $50,000 to CC-1 from a bank in Washington, D.C.   Consistent with NAZAROV's

and CC-1's instructions to W-1, the FBI directed the wire transfer first to the bank account at the

bank in New York City, New York, then to the bank account at the bank in Vienna, Austria, and

finally to the bank account at the bank in Moscow, Russia.   Later that day, W-1 received a text

message from CC-1 asking for an update on the wire transfer, and W-1 responded that the wire

transfer would happen that day.

32.   On December 20, 2016, W-1 received a text message from NAZAROV asking if

there was "anything new" regarding the wire transfer and whether he could "tell his man to look"

for the money.   W-1 then sent NAZAROV a document from the bank in Washington, D.C.,

confirming that the wire transfer occurred and told NAZAROV to forward that document to CC-1.

33.   On that same day, W-1 called CC-1.   During that call, CC-1 confirmed that he

received the wire transfer confirmation document that W-1 sent to NAZAROV.   The wire transfer

confirmation had the name of the sender redacted, and CC-1 asked W-1 whether W-1 knew the

sender.   When W-1 attempted to tell the "story" behind the $50,000 wire transfer to NAZAROV,

CC-1 stopped W-1 and informed W-1 that CC-1 did not need to know "the whole story" and that

CC-1 only needed to know whether the wire transfer originated from an individual or corporate

bank account.   CC-1 then asked W-1 whether the money being transferred was "kosher," meaning

whether or not the fraudulent nature of the proceeds was sufficiently concealed such that the bank would not stop the wire transfer from occurring.

34.     On December 23, 2016, NAZAROV sent a text message to W-1 containing a photograph of five rubber-banded stacks of what appeared to be United States currency, with a $50 bill appearing on top of the first stack.  NAZAROV informed W-1 that he received this photograph from CC-1, and was forwarding it to W-1.  Later that day, NAZAROV and W-1 spoke via telephone and NAZAROV informed W-1 that "my man has received it" and "[o]n Sunday I should receive it here."

35.     On December 28, 2016, NAZAROV sent W-1 a voice message through a text messaging application.  In that voice message, NAZAROV informed W-1 that "I received everything" and "[i]n short, after expenses forty eight four hundred [$48,400.00] was left for me." This message confirmed to W-1 that NAZAROV received the $50,000 transferred by the FBI to the bank account in Moscow, Russia, less expenses incurred by NAZAROV as a result of the transfer.

## COUNT ONE
### (Conspiracy to Commit Money Laundering)

36.     The allegations set forth in paragraphs 1 through 35 of this Indictment are realleged and incorporated by reference therein.

### The Conspiracy

37.     From on or about December 14, 2016, through on or about December 28, 2016, in the District of Columbia, and within the extraterritorial jurisdiction of the United States and elsewhere, defendant STANISLAV NAZAROV and CC-1, and others known and unknown to the grand jury, did knowingly conspire, combine, confederate, and agree with each other to violate:

10

a.    18 U.S.C. § 1956(a)(2)(A), by transporting, transmitting, and transferring and attempting to transport, transmit, or transfer, monetary instruments or funds, from a place in the United States to or through a place outside the United States, that is Russia and/or Israel, with the intent to promote the carrying on of specified unlawful activity, to wit, wire fraud;

b.    18 U.S.C. § 1956(a)(2)(B)(i), by transporting, transmitting, and transferring and attempting to transport, transmit, or transfer, monetary instruments or funds, from a place in the United States to or through a place outside the United States, that is Russia and/or Israel, knowing that the monetary instruments or funds involved in such transportation, transmission or transfer were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, to wit, wire fraud;

c.    18 U.S.C. § 1956(a)(3)(A) and (B), by conducting or attempting to conduct a financial transaction involving property represented by a person at the direction of, or with the approval of a Federal official authorized to investigate or prosecute violations of Title 18, United States Code, Section 1956, to promote the carrying on of specified unlawful activity, to wit, wire fraud, and to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity, to wit, wire fraud; and

d.    18 U.S.C. § 1957, by knowingly engaging or attempting to engage in a monetary transaction in criminally derived property that was of a value greater than $10,000 derived from specified unlawful activity, to wit, wire fraud.

### The Objects of the Conspiracy

38.    The objects of the conspiracy were

a.    to illegally enrich the co-conspirators;

b.    to promote the co-conspirators' illegal scheme;

c.    to conceal and disguise the nature, location, source, ownership, and control of property believed to be proceeds of the co-conspirators' scheme;

d.    to engage in a monetary transaction greater than $10,000 in what the co-conspirators believed to be criminally derived property.

## The Manner and Means of the Conspiracy

39.     Among the manner and means by which NAZAROV and CC-1, and others known and unknown to the grand jury, would and did carry out the objectives of the conspiracy were the following.

a.     They would and did communicate with each other about CC-1 receiving a wire transfer of money from W-1 in the United States that CC-1 would subsequently transfer to NAZAROV in Israel.

b.     They would and did provide W-1 with a bank account in Russia that was controlled by CC-1, and which purportedly would not be "checked" by anyone outside the conspiracy, to receive the wire transfer of $50,000, which was represented by W-1 to NAZAROV as being proceeds from the cyber-phishing scheme.

c.     They would and did receive the wire transfer of the $50,000 in Russia, which FBI agents caused to be sent from the District of Columbia through two intermediary bank accounts based on information provided by NAZAROV and CC-1.

d.     They would and did withdraw that $50,000 in cash from the bank account in Russia, which CC-1 subsequently transferred to NAZAROV in Israel.

## Acts in Furtherance of the Conspiracy

40.     The allegations set forth in paragraphs 25 through 35 of this Indictment are realleged and incorporated by reference herein as acts in furtherance of the conspiracy.

**(Conspiracy to Commit Money Laundering, in violation of
Title 18, United States Code, Section 1956(h))**

### COUNT TWO
**(Money Laundering)**

41.     The allegations set forth in paragraphs 1 through 35 of this Indictment are realleged and incorporated by reference herein.

42.     Between on or about December 14, 2016, and on or about December 28, 2016, in the District of Columbia, within the extraterritorial jurisdiction of the United States, and elsewhere, defendant STANISLAV NAZAROV, did transport, transmit or transfer and attempt to transport, transmit, or transfer monetary instruments or funds, that is a wire transfer, from a place in the United States to or through a place outside the United States, that is Russia and/or Israel, with the intent to promote the carrying on of a specified unlawful activity, to wit, wire fraud.

**(Money Laundering, in violation of Title 18, United States Code,
Sections 1956(a)(2)(A) and 2)**

### COUNT THREE
**(Money Laundering)**

43.     The allegations set forth in paragraphs 1 through 35 of this Indictment are realleged and incorporated by reference herein.

44.     Between on or about December 14, 2016, and on or about December 28, 2016, in the District of Columbia, within the extraterritorial jurisdiction of the United States, and elsewhere, defendant STANISLAV NAZAROV, did conduct and attempt to conduct a financial transaction involving property represented by a person at the direction of, or with the approval of a Federal official authorized to investigate or prosecute violations of Title 18, United States Code, Section 1956, to be proceeds of specified unlawful activity, to wit, wire fraud, with the intent: a) to promote the carrying on of specified unlawful activity, to wit, wire fraud, and b) to conceal or

13

disguise the nature, location, source, ownership and control, of property he believed to be the proceeds of a specified unlawful activity, to wit, wire fraud.

**(Money Laundering, in violation of Title 18, United States Code,
Sections 1956(a)(3)(A) and (B) and 2)**

## CRIMINAL FORFEITURE ALLEGATION

1.      Upon conviction of any of the offenses alleged in Counts One, Two, and/or Three, the defendant shall forfeit to the United States any property, real or personal, involved in such offenses, or any property traceable to such property, as a result of these offenses, pursuant to 18 U.S.C. § 982(a)(2)(A).    The United States will also seek a forfeiture money judgment against the defendant equal to the value of any property constituting, or derived from, proceeds the defendant obtained directly or indirectly, as the result of that offense, pursuant to 18 U.S.C. § 982(a)(2)(A).

2.      If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

        a.      cannot be located upon the exercise of due diligence;

        b.      has been transferred or sold to, or deposited with, a third party;

        c.      has been placed beyond the jurisdiction of the Court;

        d.      has been substantially diminished in value; or

        e.      has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Section 982(a)(1) and (a)(2),
and Title 21, United States Code, Section 853(p))**

A TRUE BILL:

FOREPERSON.

ATTORNEY OF THE UNITED STATES IN
AND FOR THE DISTRICT OF COLUMBIA