### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>STANISLAV NAZAROV<br>a.k.a., "SLAVA," and<br>a.k.a., "SLAVIK,"<br><br>Defendant. | CRIMINAL NO. 17-cr-00018 (CKK)<br><br>**FILED**<br>DEC 1 2 2017<br>Clerk, U.S. District & Bankruptcy<br>Courts for the District of Columbia |

### REDACTED STATEMENT OF OFFENSE

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, STANISLAV NAZAROV, with the concurrence of his attorney, agree and stipulate as follows:

### Introduction

1.      The defendant, STANISLAV NAZAROV ("NAZAROV"), was a resident of Israel.

2.      Co-Conspirator 1 ("CC-1") was a resident of Russia.

### NAZAROV's Partnership with W-1

3.      Witness 1 ("W-1") served as a money launderer for various individuals and groups engaged in fraudulent schemes in Israel and elsewhere.

4.      In or around 2013, W-1 and NAZAROV agreed to become partners and to share in the proceeds of fraudulent schemes going forward.  As part of their partnership, NAZAROV agreed to provide bank accounts to W-1 to use in W-1's money laundering activities.  NAZAROV also agreed to use his connections and reputation in the criminal community in Israel to protect

(N)

W-1 and to defuse any disagreements that arose between W-1 and other fraudsters. In exchange, W-1 agreed to provide NAZAROV with a share of the proceeds that W-1 made from any other fraudulent schemes in which W-1 became involved.

### The Cyber-Phishing Attack on Company 2

5.      Persons A, B, and C were residents of Israel. Company 1 was a reinsurance company owned by the Government of India and headquartered in Mumbai, India. Company 2 was a wholly-owned subsidiary of Company 1 and was located in Dubai, United Arab Emirates.

6.      Between on or about June 3, 2015, and on or about June 9, 2015, Persons A, B, and C engaged in a cyber-phishing scheme to defraud Company 2. As part of that scheme to defraud, Persons A, B, and C sent email messages to the director of Company 2, which were created to appear as if they were being sent from the president of Company 1 and Company 1's outside counsel. In those email messages, Persons A, B, and C led the director of Company 2 to falsely believe that Company 2 was being directed by Company 1's president to purchase shares of a United States-based company for $7,135,200.

7.      Through these fraudulent emails, Persons A, B, and C caused the director of Company 2 to believe that the share purchase transaction was confidential and could not be discussed with anyone except for Company 1's president and outside counsel. Furthermore, Persons A, B, and C caused the director of Company 2 to falsely believe that a down-payment of 20% of the share purchase price (i.e., $1,427,040) had to be paid by Company 2 before the share purchase agreement could be executed.

8.      Persons A, B, and C then solicited W-1 to obtain a bank account in the United States to receive the fraudulent wire transfer of approximately $1.4 million. W-1 contacted Witness 2 ("W-2"), who was in the United States at the time, to obtain such a bank account. W-2 provided

W-1 with a bank account at a Washington, D.C., bank in the name of T.O. International Group LLC (Account No. XXXXXX9252).

9.     W-1 provided Account No. XXXXXX9252 to Persons A, B, and C.  Persons A, B, and C then posed as outside counsel to Company 1, emailed that bank account number to the director of Company 2, and requested that the $1.4 million be wire-transferred into that account.

10.    On June 4, 2015, Company 2's director, in reliance on the fraudulent emails sent by Persons A, B, and C, caused a wire transfer in the amount of $1.4 million to be sent from Company 2's bank account in Dubai, United Arab Emirates, to Account No. XXXXXX9252, which was located in Washington, D.C.

11.    All of the email communications sent by Persons A, B, and C, which fraudulently induced the director of Company 2 to send the wire transfer of $1.4 million to the bank account in Washington, D.C., were transmitted using United States-based email accounts and, as a result, traversed the United States' wires.  Furthermore, the fraudulently-induced wire transfer of $1.4 million from Company 2 to Account No. XXXXXX9252 in Washington, D.C., traversed the United States' wires.

12.    NAZAROV later learned that the fraud perpetrated by Persons A, B, and C was supported by members of a crime family whose identity is known to Israeli law enforcement (the "Crime Family").

### Subsequent Communications Between W-1 and NAZAROV

13.    As part of their partnership, on or about June 4, 2015, while both were in Israel, W-1 informed NAZAROV of the successful cyber-phishing attack on Company 2 by Persons A, B, and C, and the wire transfer of the $1.4 million to the bank account in the United States.

3

14.     On or about June 9, 2015, W-1 traveled from Israel to Washington, D.C., to meet with W-2 to determine how to distribute the $1.4 million from the bank account in Washington, D.C., to Persons A, B, C, NAZAROV, and others.  While W-1 was in Washington, D.C., the Federal Bureau of Investigation ("FBI") arrested W-1 and W-1 agreed to cooperate with the United States government.

15.     Between on or about June 16, 2015, through on or about November 16, 2015, W-1 engaged in numerous recorded conversations with NAZAROV, both telephonically and in-person in Israel, regarding W-1's payment of the amounts owed to Persons A, B, C, NAZAROV, and others in connection with the $1.4 million fraud.  In those conversations, NAZAROV requested that he be paid the money he was owed under his previous agreement with W-1.  On or about June 16, 2015, W-1 informed NAZAROV that W-1 had withdrawn the $1.4 million and given it to another individual to launder, but that this other individual had absconded with the money and been stopped while driving his car in Virginia, and that the Prince William County police in Virginia had seized all of the money (this story was concocted by the FBI).  In his conversations with W-1, NAZAROV also explained the efforts he was undertaking to allay members of the Crime Family who were demanding payment of their share of the $1.4 million in fraud proceeds. In addition, NAZAROV arranged a meeting between W-1 and at least one member of the Crime Family so W-1 could explain why W-1 had not yet obtained and distributed the $1.4 million to the co-conspirators.

### NAZAROV's Money Laundering Conspiracy with CC-1 and Others

16.     In December, 2016, NAZAROV had another series of recorded conversations with W-1.  They discussed arranging payment to NAZAROV for what he was owed from the $1.4 million fraud based on the previous agreement between them.  On or about December 14, 2016,

while in the District of Columbia and at the direction of the United States government, W-1 initiated a recorded telephone conversation with NAZAROV. In that conversation, W-1 represented to NAZAROV that W-1 could wire-transfer $50,000 to NAZAROV. NAZAROV asked W-1, "Fine. And you give me?" W-1 responded, "I give you for the work you did for me vis-à-vis the Arabs, and that's it." NAZAROV then asked, "When can I get it and how?" NAZAROV then asked if the money was "kosher." NAZAROV stated, "If it is not kosher, I will give you a telephone [number of] a man in Moscow. You talk to him and send to him. He will take what is due to him and the rest he will give to me." W-1 explained that the $50,000 would be transferred from a different account than the account where the $1.4 million was received, and that the wire transfer would not be recalled. In a recorded telephone call later that same day, W-1 told NAZAROV, "Uh, it comes from a place, bro, no recall will come, nothing. It is like, bro, a baby's ass." NAZAROV then responded, "If this is so, I will give you a kosher account," to which W-1 responded, "Clearly. Fine, then let me know."

17. On that same day, NAZAROV spoke to W-1 in a recorded telephone call and informed W-1 that he would introduce W-1 to a Russian acquaintance who might be able to receive the wire transfer. Later that day, NAZAROV sent text and voice messages to W-1 providing a phone number for an individual who NAZAROV stated would assist W-1 in transferring the money.

18. After receiving these messages from NAZAROV, W-1 called the number and spoke with an individual purportedly located in Moscow, Russia (hereinafter, "CC-1"). On that call, CC-1 explained to W-1 that CC-1 could receive the wire transfer of $50,000 from W-1, and could then transfer that money to NAZAROV. CC-1 also explained to W-1 that the bank account

that would be receiving the $50,000 wire transfer was in CC-1's wife's name, whom CC-1 claimed was not a Russian citizen and therefore nobody would "check" W-1's wire transfer.

19.     Following that call with CC-1, W-1 called NAZAROV and told NAZAROV that W-1 had spoken with CC-1 and that CC-1 would be receiving the wire transfer. W-1 also informed NAZAROV that CC-1 would send NAZAROV a bank account to receive the $50,000 wire transfer and that, upon receiving that account information from CC-1, NAZAROV should forward that account information to W-1.

20.     W-1 then called CC-1. W-1 told CC-1 to send the information for the bank account that would receive the $50,000 wire transfer directly to NAZAROV. W-1 also told CC-1 that NAZAROV would then forward that account information to W-1. CC-1 agreed and informed W-1 that the bank account information would be sent by CC-1 to NAZAROV the following morning.

21.     On December 16, 2016, W-1 received a text message from NAZAROV containing details for accounts at three banks: (1) a bank in New York City, New York; (2) a bank in Vienna, Austria; and (3) a bank in Moscow, Russia. W-1 then received a text message from CC-1 stating that CC-1 had sent the bank account information to NAZAROV. The text message from CC-1 also stated that W-1 should list the "reason of payment" for the wire transfer as being "financial help."

22.     On December 19, 2016, the FBI initiated a wire transfer of $50,000 to CC-1 from a bank in Washington, D.C. Consistent with NAZAROV's and CC-1's instructions to W-1, the FBI directed the wire transfer first to the bank account at the bank in New York City, New York, then to the bank account at the bank in Vienna, Austria, and finally to the bank account at the bank in Moscow, Russia. An employee at the bank informed the FBI that the three bank accounts were needed because a wire transfer could not be effectuated directly to Russobank (the wire would

6

need to pass through the New York and Vienna bank accounts first). Later that day, W-1 received a text message from CC-1 asking for an update on the wire transfer, and W-1 responded that the wire transfer would happen that day.

23.     On December 20, 2016, W-1 received voice messages from NAZAROV asking if there was "anything new" regarding the wire transfer and whether he could "tell the man to look" for the money.  W-1 then sent NAZAROV a document from the bank in Washington, D.C., confirming that the wire transfer had occurred and told NAZAROV to forward that document to CC-1.

24.     On that same day, W-1 called CC-1.  During that call, CC-1 confirmed that he received the wire transfer confirmation document that W-1 sent to NAZAROV.  The wire transfer confirmation had the name of the sender redacted, and CC-1 asked W-1 whether W-1 knew the sender.  When W-1 attempted to tell the "story" behind the $50,000 wire transfer to NAZAROV, CC-1 stopped W-1 and informed W-1 ". . . only one thing I need from you, not the whole story, I only need you to tell me that this is from physical account. . . and it is kosher money. . . and this is kosher one and nobody asks this money [UI] when wants [UI] back. . ."  W-1 assured CC-1 that, ". . . nobody will ask never this money back . . .ok?"  CC-1 responded, "Ok, very good.  That is the only thing I need, that's it."

25.     On December 23, 2016, NAZAROV sent a text message to W-1 containing a photograph of five rubber-banded stacks of what appeared to be United States currency, with a $50 bill appearing on top of the first stack.  NAZAROV informed W-1 that he had received this photograph from CC-1.  Later that day, NAZAROV and W-1 spoke via telephone and NAZAROV informed W-1 that "my man has received it" and "[o]n Sunday I should receive it here."

26.    On December 28, 2016, NAZAROV sent W-1 a voice message through a text messaging application.   In that voice message, NAZAROV informed W-1 that "I received everything" and "[i]n short, after expenses forty eight four hundred [$48,400.00] was left for me." This message confirmed to W-1 that NAZAROV received the $50,000 transferred by the FBI to the bank account in Moscow, Russia, less expenses incurred by NAZAROV as a result of the transfer.

### Limited Nature of Proffer

27.    This proffer of evidence is not intended to constitute a complete statement of all facts known by the defendant, but is a minimum statement of facts intended to provide the necessary factual predicate for the guilty plea.  The limited purpose of this proffer is to demonstrate that there exists a sufficient legal basis for defendant's plea of guilty to the charged crimes.

Respectfully submitted,

JESSIE K. LIU
United States Attorney
D.C. Bar No. 472845

By:    _____

DIANE G. LUCAS, D.C. Bar No. 443610
DAVID B. KENT, D.C. Bar No. 482850
MICHAEL J. MARANDO, N.Y. Bar No. 482850
Assistant United States Attorneys
(202) 252-7724 (Lucas)
(202) 252-7762 (Kent)
(202) 272-7068 (Marando)
Diane.Lucas@usdoj.gov
David.Kent@usdoj.gov
Michael.Marando@usdoj.gov

8

## DEFENDANT'S ACCEPTANCE

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charges against me. It does not include all of the facts known to me regarding these offenses. I make this statement knowingly and voluntarily and because I am, in fact, guilty of the crimes charged. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of Offense fully.

I have read every word of this Statement of the Offense, or have had it read to me. Pursuant to Federal Rule of Criminal Procedure 11, after consulting with my attorney, I agree and stipulate to this Statement of the Offense, and declare under penalty of perjury that it is true and correct.

Dated: 12/12/17

STANISLAV NAZAROV
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt and stipulate to this Statement of the Offense as true and accurate.

Dated: 12/12/2017

AMY JEFFRESS
Attorney for Defendant Stanislav
Nazarov