**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.

STANISLAV NAZAROV,

*Defendant.*

Criminal Case No. 1:17-CR-00018 (CKK)

The Honorable Colleen Kollar-Kotelly

**MEMORANDUM IN AID OF SENTENCING**

Stanislav Nazarov, through counsel, provides the following information to assist the Court in determining an appropriate sentence. Mr. Nazarov is a resident of Israel and citizen of Israel and Russia who had never previously set foot in the United States and was extradited for purposes of these proceedings. He accepted responsibility for his offense by entering an early guilty plea and wishes above all else to return to Israel to be reunited with his family.

Mr. Nazarov pled guilty to one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). As the Probation Officer correctly determined, the applicable United States Sentencing Guidelines ("Guidelines") range for this offense is 12-18 months, based on a total offense level of 13 and a criminal history category of I. Mr. Nazarov respectfully submits that a Guidelines sentence of 12 months and one day—the time he will have served between his arrest in Israel on March 1, 2017 and the scheduled sentencing hearing on March 2, 2018—is sufficient, but not greater than necessary, to satisfy the goals of federal sentencing in this case. *See* 18 U.S.C. § 3553(a).

Mr. Nazarov regrets the conduct for which he has pled guilty, and he understands the need for an appropriate penalty. He has taken steps to minimize the burden of these proceedings

on the government and Court, by consenting to extradition from Israel, waiving his right to a detention hearing in the United States, and pleading guilty at an early stage. Mr. Nazarov's goal throughout the process has been to serve his sentence and return as quickly as possible to his family in Israel: his wife of 24 years, their seven children, and especially his mother, who is in the final stages of terminal cancer and has depended on him heavily for many years. Both the limited nature of the offense and Mr. Nazarov's history and characteristics warrant a sentence at the low end of the Guidelines range. By contrast, continued incarceration in the United States, where Mr. Nazarov has no ties, would not serve any of the purposes of sentencing identified in 18 U.S.C. § 3553(a)(2). Mr. Nazarov has been sufficiently punished; a within-Guidelines sentence satisfies the need for deterrence; neither the U.S. nor Israeli public will be harmed by his release; and returning Mr. Nazarov to Israel, where he has a stable and happy home life and a strong support network, would facilitate his rehabilitation far more than continued detention at the D.C. Jail. A Guidelines sentence of 12 months and one day would be appropriate under these circumstances and would impose a sufficient penalty for the offense.

## ARGUMENT

### I. A Sentencing Range of 12-18 Months, Which Is Consistent with the Presentence Investigation Report and the Plea Agreement, Is the Correct Guidelines Calculation

The final Presentence Investigation Report ("PSR") adopts a Guidelines range of 12-18 months, which is consistent with the written plea agreement entered into by the parties. PSR, ECF No. 26, ¶¶ 50-64, 90; Plea Agreement, ECF No. 21, at 2-4. The plea agreement sets out calculations for two alternative ranges: 12-18 months if the two-level enhancement for "sophisticated laundering" does not apply, and 18-24 months if it does. The total offense level and criminal history computations in the PSR are identical to what the plea agreement provided as the calculation, without the enhancement which the parties agreed to contest. This

consistency supports the conclusion that a Guidelines range of 12-18 months is an appropriate benchmark for the Court. *United States v. Akhigbe,* 642 F.3d 1078, 1084 (D.C. Cir. 2011) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)). Further, the Probation Officer correctly declined to apply the enhancement for "sophisticated laundering," which is reserved for "complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense." *See* U.S.S.G. § 2S1.1(b)(3) & note 5(A); PSR ¶ 52.

**A. The PSR Accurately Calculates Mr. Nazarov's Guidelines Range**

The Probation Officer issued the final PSR on February 20, 2018, applying a total offense level of 13 and a criminal history category of I to calculate a Guidelines range of 12-18 months. PSR ¶ 90. The final PSR correctly applies the Guidelines to Mr. Nazarov's case.

The PSR sets out the following offense level computation, which is based on the 2016 Guidelines and Mr. Nazarov's conviction for conspiracy to commit money laundering under 18 U.S.C. § 1956:

| | |
|---|---|
| Base Offense Level[1] | 14 |
| Victim Related Adjustment | 0 |
| Specific Offense Characteristics[2] | +2 |
| Adjustment for Role in the Offense | 0 |
| Adjustment for Obstruction of Justice | 0 |
| Adjusted Offense Level (Subtotal) | 16 |

[1] Regarding the base offense level, the PSR explains: "The guideline for 18 USC § 1956(h) offenses is found in USSG §2S1.1 of the guidelines. That section instructs that the base offense level is calculated by adding eight levels to the value of the funds that were laundered, which in this case is at least $40,000 but less than $95,000, resulting in the addition of six levels. Therefore, the base offense level is 14. USSG §2S1.1(a)(2) and §2B1.1(b)(1)(D)." PSR ¶ 51.

[2] Regarding the specific offense characteristics, the PSR states: "The defendant was convicted under 18 USC § 1956. Therefore, two levels are added, USSG §2S1.1(b)(2)(B)." PSR ¶ 52.

| | |
|---|---|
| Chapter Four Enhancement | 0 |
| Acceptance of Responsibility (U.S.S.G. § 3E1.1(a)) | -2 |
| Acceptance of Responsibility (U.S.S.G. § 3E1.1(b)) | -1 |
| **Total Offense Level** | **13** |

PSR ¶¶ 50-60.

Because Mr. Nazarov has no convictions in the United States, the Probation Officer determined that he has a criminal history score of zero and criminal history category of I. PSR ¶ 63.

As noted, both the total offense level and criminal history computations in the PSR are identical to those agreed to by the parties, except that the plea agreement did not resolve whether the enhancement for "sophisticated laundering" should apply. The only other applicable adjustments are the two reductions for acceptance of responsibility, which the government acknowledged are appropriate under the circumstances present here. Plea Agreement at 3. By pleading guilty at an early stage, signing detailed written plea materials, and participating through an interpreter in the plea hearing on December 12th, Mr. Nazarov demonstrated acceptance of responsibility for his offense and notified the government of his plea in time to conserve government and judicial resources.[3] *See* Plea Agreement; Statement of Offense (Redacted), ECF No. 20; Minute Entry of Dec. 12, 2017.

Thus, the calculations in the PSR support an independent conclusion that a Guidelines range of 12-18 months should apply.

[3] Section 3E1.1(a) provides for a two-level decrease where "the defendant clearly demonstrates acceptance of responsibility for his offense." Section 3E1.1(b) provides for a one-level decrease where the government affirms that "the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently."

**B. The Enhancement for "Sophisticated Laundering" Should Not Apply**

The enhancement for "sophisticated laundering" is at Section 2S1.1(b)(3) of the Guidelines. Note 5(A) to that provision defines "sophisticated laundering" as "complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense." The note further provides that "[s]ophisticated laundering typically involves the use of—(i) fictitious entities; (ii) shell corporations; (iii) two or more levels (*i.e.*, layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or (iv) offshore financial accounts." None of those factors applies here.

Mr. Nazarov's case resulted from an FBI sting operation in which he agreed to transfer $50,000 from Witness 1, the FBI's cooperating witness, to himself in Israel. Witness 1 initiated contact with Mr. Nazarov on or about December 14, 2016 and, at the direction of the United States government, "represented to [Mr. Nazarov] that [Witness 1] could wire-transfer $50,000 to [Mr. Nazarov]." Statement of Offense ¶ 16. Mr. Nazarov and Witness 1 then coordinated with each other and with Co-Conspirator 1 ("CC-1"), an acquaintance of Mr. Nazarov's in Russia, to effect the transfer over a period of approximately two weeks. Statement of Offense ¶¶ 16-26 (describing conduct between December 14, 2016 and December 28, 2016). After Mr. Nazarov provided the necessary account information to Witness 1, the FBI wired funds from its account in Washington to an account in Moscow. Statement of Offense ¶¶ 21-22. Due to international banking requirements, the funds passed through accounts in New York City and Vienna, Austria, on the way to Moscow. Statement of Offense ¶ 22. Mr. Nazarov ultimately received $48,400 of the funds in Israel, in cash, from an associate of CC-1. *See* Statement of Offense ¶ 26.

In determining whether conduct is sufficiently "complex or intricate" to warrant the "sophisticated laundering" enhancement, courts look to the four Note 5(A) factors. *See* U.S.S.G. § 2S1.1(b)(3) & note 5(A). There is no dispute that the offense here did not involve fictitious entities or shell corporations, so the question is whether the "layering" and "offshore financial account" factors apply. Neither does.

First, the offense did not involve "layering" of transactions. Courts sometimes apply an enhancement based on layering where a money-laundering scheme is complex and consists of multiple levels of activity designed to obscure the source of the funds. Typical layering involves not just multiple transactions but conversion between various forms of property: for example, switching between cash, cashier's checks, and tangible property, or using real estate purchased with tainted funds as collateral for loans. *See, e.g.*, *United States v. Charon*, 442 F.3d 881, 891-92 (5th Cir. 2006) (defendant gave cash from drug proceeds to third party, had third party obtain a cashier's check in the third party's name, and used that check as a down payment for a piece of real estate); *United States v. Miles*, 360 F.3d 472, 482 (5th Cir. 2004) (defendant made four transactions over the course of several days, first converting a check for $45,000 into three cashier's checks and cash, next depositing two of those checks into her bank account and taking out a fourth cashier's check from that bank, subsequently using the fourth check to purchase a brand-new Mustang convertible, and finally cashing the third cashier's check at a casino). These kinds of conversions aid in concealment. That is not the situation here. The transaction between Witness 1 and Mr. Nazarov involved a single bank transfer from the FBI's account in Washington to the account in Russia (via the New York City and Vienna accounts), followed by Mr. Nazarov's receipt of the funds in cash in Israel. The statement of offense confirms that it was the bank's requirement, not Mr. Nazarov's, that the funds pass through the New York and

Vienna accounts en route to Russia. *See* Statement of Offense ¶ 22 ("An employee at the bank informed the FBI that the three bank accounts were needed because a wire transfer could not be effectuated directly to Russobank (the wire would need to pass through the New York and Vienna bank accounts first)."). Mr. Nazarov's receipt of the funds in Israel did not involve their conversion into another form of property or even a second bank transfer. Rather, he received the funds in cash from an associate of the Russian account holder. It is difficult to imagine a less sophisticated transaction that would still meet the statutory elements of money laundering.

Second, the offense did not involve "offshore financial accounts." The use of offshore accounts can make it easier for U.S. actors to launder funds and hide that activity from U.S. law enforcement, which is why some uses of offshore accounts justify the enhancement. That concern does not apply here. Mr. Nazarov is a citizen of Israel and Russia who had never set foot in the U.S. until he was extradited for this case. He received the funds in Israel, where he lives, via an associate in Russia. These countries are not "offshore" for him.

Mr. Nazarov's conduct was not "complex or intricate." *See* U.S.S.G. § 2S1.1 note 5(A). He made only a single transfer of FBI funds, to himself. If this conduct justifies the enhancement, virtually all money laundering would qualify, and courts have recognized that some money laundering must be considered ordinary for Section 2S1.1(b)(3) to retain its meaning. *See, e.g.*, *United States v. Huber*, 462 F.3d 945, 951-52 (8th Cir. 2006) (adopting probation officer's conclusion that enhancement should not apply because multimillion-dollar scheme to defraud federal farm program did not involve the use of shell corporations, offshore accounts, or "layer" transactions); *United States v. Hanna*, 661 F.3d 271, 283 (6th Cir. 2011) (explaining that district court had declined to apply the enhancement in connection with an international shipping conspiracy involving false letters of credit, false shipping records used to

obtain payment under those letters, and the distribution of approximately $9.5 million among participants in the scheme); *United States v. Eckstein*, No. CR 12-3182 JB, 2016 WL 546663, at *10 (D.N.M. Feb. 3, 2016) (rejecting enhancement for defendant convicted of laundering drug proceeds through his car wash and real estate business because 19-person scheme had the characteristics of a "typical money laundering operation"). For the reasons discussed above, the Probation Officer correctly concluded that the two-level enhancement for "sophisticated laundering" should not apply.

## II. A Sentence of 12 Months and One Day Is Sufficient, But Not Greater Than Necessary, to Satisfy the Purposes of Federal Sentencing

Under the current advisory Guidelines scheme, the court's sentencing determination involves a two-step process. "A district court begins by calculating the appropriate Guidelines range, which it treats as 'the starting point and the initial benchmark' for sentencing." *United States v. Akhigbe,* 642 F.3d 1078, 1084 (D.C. Cir. 2011) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). "Then, 'after giving both parties an opportunity to argue for whatever sentence they deem appropriate,' the court considers all of the section 3553(a) sentencing factors and undertakes 'an individualized assessment based on the facts presented.'" *Id.* (quoting *Gall*, 552 U.S. at 49-50). The ultimate sentence is an exercise of the court's discretion. *Freeman v. United States*, 564 U.S. 522, 529 (2011).

The court's task in considering the Section 3553(a) factors is to impose a sentence that is "'sufficient, but not greater than necessary, to comply with' the purposes of federal sentencing." *Id.* (quoting 18 U.S.C. § 3553(a)). Here, the relevant Section 3553(a) factors are: (1) the nature and circumstances of the offense; (2) Mr. Nazarov's history and characteristics; (3) the applicable Guidelines range; and (4) "the need for the sentence imposed," which corresponds to

the four purposes of sentencing: retribution, deterrence, incapacitation, and rehabilitation.[4] *See* 18 U.S.C. § 3553(a)(1),(2),(4); *Tapia v. United States*, 564 U.S. 319, 325 (2011). A Guidelines sentence of 12 months and one day is consistent with these factors.

**A. The Nature and Circumstances of the Offense Warrant a Sentence at the Low End of the Guidelines Range**

The relevant facts are set out in the Statement Offense. Viewed as a whole, the conduct they reflect warrants a sentence at the low end of the Guidelines range.

First, Mr. Nazarov's role in any larger scheme was extremely limited. This case involves a single transfer of FBI funds by three participants: Mr. Nazarov, Witness 1, and CC-1. After Witness 1 proposed the transfer, Mr. Nazarov introduced him to CC-1, and the participants subsequently exchanged information directly through phone calls, text messages, and audio messages. Statement of Offense ¶¶ 16-26. The entire process—from the initial proposal to Mr. Nazarov's receipt of the funds in Israel—took approximately two weeks. Statement of Offense ¶¶ 16-26. The statement of offense does not identify any other transfers involving Mr. Nazarov. Nor does it describe involvement by Mr. Nazarov in any underlying fraudulent scheme.

Second, the offense has only a minimal connection to the United States. At the time of the offense, Mr. Nazarov was a resident of Israel who had never set foot in the United States, and he did not purposefully direct funds there or choose the location as a site for money laundering. Rather, the link to the United States was established solely by the FBI, which directed Witness

[4] The Section 3553(a) factors include: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed"; (3) "the kinds of sentences available"; (4) the kinds of sentence and the sentencing range established [in the Guidelines]; (5) "any pertinent policy statement . . . issued by the Sentencing Commission"; (6) "the need to avoid unwarranted sentence disparities"; and (7) "the need to provide restitution to any victims of the offense." Because Mr. Nazarov requests a term of incarceration within the applicable Guidelines range, and because this offense involves no victims who require restitution, this memorandum focuses on the first through fourth factors.

1's interactions with Mr. Nazarov and determined that it would initiate the transfer from its account in Washington, D.C. Statement of Offense ¶ 16 (stating that "[Witness 1] explained that the $50,000 would be transferred from a different account"), ¶ 22 ("[T]he FBI initiated a wire transfer of $50,000 to CC-1 from a bank in Washington, D.C."). Without minimizing Mr. Nazarov's actions—which were illegal regardless of the extent of his ties to the U.S.—these circumstances are relevant to the sentencing analysis because they show that Mr. Nazarov did not purposefully direct the conduct toward the United States.

**B. Mr. Nazarov's History and Characteristics Warrant a Sentence at the Low End of the Guidelines Range**

Mr. Nazarov's history and characteristics also suggest that a sentence of 12 months and one day is sufficient to serve the goals of sentencing and that a longer sentence is not necessary or appropriate. On the contrary, returning Mr. Nazarov to his family and community as soon as possible would benefit all involved.

Family is extremely important to Mr. Nazarov, and his life in Israel is characterized by strong relationships with his wife, children, and parents, all of whom live in the same town. Mr. Nazarov moved to Or Aqiva, Israel with his parents when he was in his early 20s and has lived there since. PSR ¶ 70. Mr. Nazarov and his wife have been married for 24 years. PSR ¶ 69. They have seven children, all of whom live at home with them. PSR ¶ 69. Two are in college, four are primary or secondary school students, and the youngest is a toddler. PSR ¶ 69. Mr. Nazarov has a close relationship with all of his children, and they miss him dearly. In the attached letter, Mr. Nazarov's children describe him as someone who brings happiness and laughter to the household and who will "always help everyone and fill everyone around with joy and love." Ex. A (Dec. 24, 2017 Letter of Mr. Nazarov's Children (original and English translation provided). They ask for his quick return. Ex. A.

Mr. Nazarov is also very close with his parents. He has described his childhood as "normal" and "happy" and his relationship with his parents as "beautiful." PSR ¶¶ 66, 67. His parents live nearby in Or Aqiva, and the families are a part of each other's daily lives. In recent years, as Mr. Nazarov's mother has undergone treatment for cancer and her health has progressively worsened, she has relied on him heavily for assistance and emotional support. The letters that counsel has previously submitted to the Court from Dr. Roni Shapira, an oncologist at The Oncology Institute, provide details about Mrs. Nazarov's condition. *See* Nov. 2, 2017 Letter of Dr. Roni Shapira; July 20, 2017 Letter of Dr. Roni Shapira; *see also* PSR ¶ 66 (describing July 20, 2017 letter). The letters explain that Mrs. Nazarov's condition is terminal and that the support of her family is crucial to her quality of life during her remaining weeks or months. Mr. Nazarov's father is also ill, with Parkinson's disease. *See* Ex. B (Dec. 24, 2017 Letter of Mr. Nazarov's Parents, original and translation provided). In the attached letter, Mr. Nazarov's parents explain that they need their son very much and ask for his return to Israel as soon as possible. Ex. B.

Mr. Nazarov has explained that he has an especially close relationship with his mother and that she has relied on him more than on other members of the family. Prior to his arrest, he often spent hours each day visiting or speaking with her by phone. His absence has been extremely difficult for Mrs. Nazarov as her physical and emotional health has declined. *See* Nov. 2, 2017 Letter of Dr. Roni Shapira (explaining that Mrs. Nazarov is "very limited on mobility" and is "suffering from depression as of her sickness—with long hours of crying and dis functionality").

Mr. Nazarov is also a dedicated community member. In an attached letter, Rachamim Tzalach, an employee of the mayor's office in Or Aqiva, explains that he has known the Nazarov

family for more than 25 years and that "Stanislav was well known as a person that gave help and assistance to anyone that turned to him with a request for help." Ex. C (Aug. 15, 2017 Letter of Rachamim Tzalach); *see also* PSR ¶ 65 (describing letter). Mr. Tzalach states that Mr. Nazarov has been known to give "personal and physical help" as well as financial contributions and that "he is a father of 7 these days and assisted to kindergartens, gave donations to needed people and assistance to the Caucasus synagogue." Ex. C. He describes Mr. Nazarov as "a good and caring person for his city and its citizens." Ex. C.

Prior to his arrest in this case, Mr. Nazarov had never been incarcerated. He has one prior conviction in Israel from 2005, when he was in his 30s, for which he received a suspended sentence of seven months' incarceration and a fine of 16,000 Israeli shekels (approximately $4,600). PSR ¶ 64. He has no criminal history in the United States. PSR ¶¶ 10, 63.

Mr. Nazarov's goal throughout these proceedings has been to serve his sentence and return to his family in Israel as quickly as possible. Toward this end, he pled guilty early and took other steps to expedite the process, such as consenting to extradition and waiving his right to a detention hearing. These steps simplified the case and conserved government and judicial resources. They also show that Mr. Nazarov has accepted responsibility for his offense.

A sentence of 12 months and one day, which fully serves the purposes of sentencing, also recognizes that Mr. Nazarov's history and characteristics warrant a sentence at the low end of the range. Returning Mr. Nazarov to Israel as soon as possible is important for his family. Understandably, Mr. Nazarov is particularly anxious to get back to his mother. Because he will have served the low end of the Guidelines range by the time of his sentencing hearing, this consideration can be taken into account without compromising any of the goals of federal sentencing.

**C. A Sentence of 12 Months and One Day Falls Within the Applicable Guidelines Range**

As discussed in Section I of this memorandum, a sentence of 12 months and one day falls within the applicable Guidelines range of 12-18 months, which is consistent with the calculations in the PSR and plea agreement. "Where . . . the district judge pronounces a within-Guidelines sentence," including one "at the lower end of the Guidelines range," "little explanation is required." *United States v. Brinson-Scott*, 714 F.3d 616, 625 (D.C. Cir. 2013). A sentence of 12 months and one day fully comports with this Section 3553(a) factor.

Further, the government has agreed to cap its allocution at the mid-point of the Guidelines range. Plea Agreement at 5. Within a range of 12-15 months, a sentence of 12 months and one day is even more reasonable.

**D. A Sentence of 12 Months and One Day Services the Purposes of Retribution, Deterrence, Incapacitation, and Rehabilitation**

Finally, a sentence of 12 months and one day serves the four purposes of federal sentencing: retribution, deterrence, incapacitation, and rehabilitation. *See Tàpia v. United States*, 564 U.S. 319, 325 (2011).

First, the sentence appropriately punishes Mr. Nazarov for the offense to which he has pled guilty. As a Guidelines sentence, it is a term of incarceration the Sentencing Commission has determined is proportionate to the seriousness of the offense. But it is sufficient for the additional reason that, in light of Mr. Nazarov's unique personal circumstances, he has been punished far more than the average defendant in his situation would be.

Because this case arose from an extradition request, Mr. Nazarov has been incarcerated continuously since his arrest on March 1, 2017. He has been held at the D.C. Jail, thousands of miles from his family and friends, since October of 2017. He does not receive visits except from

legal counsel, and those visits require the use of an interpreter. The D.C. Jail has struggled to provide basic accommodations to Mr. Nazarov, who speaks Russian and Hebrew but no English. Although Mr. Nazarov has been treated well at the jail, he has had little access to reading material and is not able to converse with other inmates. For many weeks, he was not even able to place phone calls to his wife and Israeli attorneys (though these issues were eventually resolved). His imprisonment has been far more isolating than the experience of a typical inmate.

Furthermore, Mr. Nazarov's punishment is intensified by the many challenges facing his family in Israel. Dealing with a parent's illness is difficult for anyone, and a diagnosis of terminal cancer is especially devastating, but Mr. Nazarov's relationship with his mother and role in the family mean that his absence has been felt with particular force. Even if Mr. Nazarov is sentenced to 12 months and one day on March 2nd, there is no guarantee that he will make it back to Israel in time to say goodbye to his mother or to support other family members as they deal with issues related to her deteriorating health. Mr. Nazarov has struggled with these challenges throughout his incarceration, and he will continue to suffer the pain of the long distance from his family until his return to Israel.

Second, a sentence of 12 months and one day is sufficient to deter Mr. Nazarov and others from engaging in conduct of this type in the future. As discussed above, Mr. Nazarov has suffered significant personal losses as a result of the decisions that led to his arrest in this case. He will return to Israel with a felony conviction and a presumptive bar on future travel to the United States. He will have lost time with his family he can never get back—a particularly significant consideration given the family's circumstances. And he will need to start from scratch to reestablish himself in the community. With respect to general deterrence, a sentence within the applicable Guidelines range is sufficient to accomplish this goal.

Third, there is no need to incapacitate Mr. Nazarov in order to protect the community. Given Mr. Nazarov's lack of ties to the United States, the likely bar on his future travel to this country, and the minimal connection between the United States and the offense, the American public has little stake in Mr. Nazarov's continued detention. Nor would a further term of incarceration serve the public interest in Israel; on the contrary, Mr. Nazarov's family and community in Israel would benefit from his return.

Finally, a sentence of 12 months and one day would impose a significant term of incarceration while also minimizing Mr. Nazarov's time away from his daily life in Israel, making successful reintegration and rehabilitation more likely.

An additional practical consideration supports a sentence of 12 months and one day. Once Mr. Nazarov has served the sentence required by law, there will no longer be a basis to hold him in the United States. The most efficient way to return him to Israel is by commercial flight, with transportation to the airport facilitated by the Marshals. If the Court imposes a sentence of 12 months and one day on March 2nd, these arrangements can be made immediately. Mr. Nazarov has the right under the U.S.-Israel extradition treaty to serve any sentence he receives in Israel. A longer sentence may require the involvement of the Department of Justice International Prisoner Transfer Unit ("IPTU") to achieve his transfer to Israel. A shorter sentence would allow him to be removed immediately without imposing that burden on the IPTU. Counsel is willing to work with the Marshals to remove Mr. Nazarov to Israel as expeditiously as possible upon completion of his sentence.

Because a sentence at the low end of the Guidelines range is appropriate here—and because Mr. Nazarov will have served that sentence and paid his debt to society as of his sentencing hearing on March 2nd—there is no reason to delay his return to his family in Israel.

**CONCLUSION**

For the reasons above, Mr. Nazarov respectfully submits that a sentence of 12 months and one day is sufficient, but not greater than necessary, to serve the goals of federal sentencing in this case.

Dated: February 22, 2018

Respectfully submitted,

Amy Jeffress (DC Bar No. 449258)
Kaitlin Konkel (DC Bar No. 1021109)
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, DC 20001
Tel: (202) 942-5000
Fax: (202) 942-5999
Amy.Jeffress@arnoldporter.com

*Counsel for Stanislav Nazarov*

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 22nd day of February, 2018, I caused a true and correct copy of the foregoing **MEMORANDUM IN AID OF SENTENCING** to be filed and served electronically using the Court's CM/ECF system, which sent a notice of electronic filing to all counsel of record.

Amy Jeffress