UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>        v.<br><br>**STANISLAV NAZAROV,**<br>    a.k.a., "SLAVA," and<br>    a.k.a., "SLAVIK,"<br><br>        **Defendant.** | **Case No. 17-cr-00018 (CKK)** |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits this Memorandum in Aid of Sentencing. As discussed below, if the Court agrees that the 2-level enhancement for "sophisticated laundering" under U.S.S.G. § 2S1.1(b)(3) applies, the Government recommends a sentence of twenty-one (21) months imprisonment with no supervised release.

## PROCEDURAL BACKGROUND

On January 31, 2017, a grand jury indicted the defendant, Stanislav Nazarov, on three counts: (1) Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h); (2) Money Laundering, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 2; and (3) Money Laundering, in violation of 18 U.S.C. §§ 1956(a)(3)(A) and (B) and 2. The Court issued an arrest warrant that same day. On or about March 1, 2017, Israeli law enforcement arrested Nazarov on that warrant. Nazarov consented to his extradition and arrived in the United States on October 19, 2017. On October 26, 2017, Nazarov waived his detention hearing and conceded to pre-trial detention. On December 12, 2017, Nazarov pled guilty to Count One of the Indictment, charging him with Conspiracy to Commit Money Laundering. The Government agreed to dismiss at sentencing the remaining counts in the Indictment as part of his guilty plea.

**FACTUAL BACKGROUND**

As stated in the Statement of Offense, Nazarov formed a partnership with Witness One ("W-1") in or around 2013. Under their partnership, they agreed to share the proceeds of any future frauds they committed. In June 2015, W-1 participated with three other individuals ("Persons A, B, and C") in a Business Email Compromise (or "BEC") scheme committed on the Dubai subsidiary of an Indian re-insurance company ("Company 2"). In the BEC scheme, Persons A, B, and C, defrauded Company 2 by using spoofed emails, which caused a company director to unknowingly wire transfer company funds to the conspirators. As part of that BEC scheme, Persons A, B, and C needed a bank account to receive the fraudulent proceeds. W-1 contacted an acquaintance in the United States ("Witness Two" or "W-2"), who provided W-1 with a bank account at a Washington, D.C. bank. W-1 provided the bank account information to Persons A, B, and C. On June 4, 2015, Company 2 wire-transferred $1,427,040 to that bank account in the United States. W-1, who was in Israel at the time, informed Nazarov about the successful fraud and the wire transfer.

On or about June 9, 2015, W-1 traveled from Israel to Washington, D.C., to meet with W-2 to determine how to distribute the $1.4 million from the bank account in the United States to Persons A, B, C, Nazarov, and others. On June 15, 2015, the Federal Bureau of Investigation ("FBI") arrested W-1 in Washington, D.C., and W-1 agreed to cooperate. Between on or about June 16, 2015, through on or about November 16, 2015, W-1 engaged in numerous recorded conversations with Nazarov regarding payment related to the $1.4 million fraud. In those calls, the FBI learned that a known Israeli organized crime family, who was backing Persons A, B, and C, was demanding its share of the $1.4 million in fraud proceeds. That crime family was also

accusing W-1 of stealing the money.  On or about June 16, 2015, W-1 informed Nazarov that W-1 had withdrawn the $1.4 million and had given it to another individual to launder, but that the other individual had absconded with the money and had been stopped by police (this story was concocted by the FBI).  W-1 told Nazarov that the police had seized the funds.  Over the next few months, the FBI learned – through recorded calls between W-1 and Nazarov – that Nazarov was interceding on W-1's behalf to allay the concerns of the Israeli crime family.  In addition, Nazarov pressured W-1 to transfer to Israel the share of the fraud proceeds owed to that crime family and Nazarov.[1]

In November 2015, W-1 traveled to Israel and met with Nazarov, who again demanded his share of the proceeds from the $1.4 million.  During W-1's visit to Israel, which W-1 recorded, Nazarov set-up a meeting with a "debt collector" who apparently purchased W-1's debt owed to the Israeli crime family.  This debt collector informed W-1 that W-1 now owed $3 million.  The debt collector also informed W-1 that Nazarov was protecting W-1.

In December 2016, at the direction of the FBI, W-1 represented to Nazarov that W-1 could wire-transfer $50,000 to Nazarov.  W-1 stated, "I give you for the work you did for me vis-à-vis the Arabs, and that's it."  Nazarov readily agreed to accept that money, asking, "When can I get it and how?"  One of Nazarov's first questions to W-1 was whether the money was "kosher."  On that point, the following conversation occurred:

    SN:    Is it kosher?[2]

---

[1] In those recorded calls, Nazarov also questioned W-1 why W-1 did not use one of Nazarov's accounts to transfer the money.  Nazarov informed W-1 that he could receive money in New York and have it transferred to Milan.

[2] According to W-1, the word "kosher" refers to whether or not the wire transfer will be stopped by the bank as being fraudulent.  When a bank stops a wire transfer based on fraud, the bank

| | | |
|---|---|---|
| W-1: | | It comes, bro, this is what, this… it comes from another account. There will not be a recall or anything like it, God Forbid. |
| SN: | | Bro, you tell me: if this is kosher, I can receive it. If it is not kosher, you say [so], I will send [you] to someone else, you talk to him and close [the deal] with him. If it is kosher, [W-1], [UI][3]. |
| W-1: | | Bro, I'm with you. There will not be a recall, I am already telling you. No way. I am telling you, this is the man, the man gives the money, he transfers to the account. |
| SN: | | From where will he transfer this money? |
| W-1: | | From where will he transfer? I will check and tell you. |
| SN: | | Yes. Then check. I will give you a certain account, bro. No problem. |
| W-1: | | OK. |
| SN: | | If it is kosher. If it is not kosher, I will give you a telephone [number of] a man in Moscow. You talk to him and send to him. He will take what is due to him and the rest he will give to me. |

Nazarov then provided W-1 with a phone number for his "man in Moscow," referred to as Co-Conspirator 1 ("CC-1") in the Indictment and Statement of Offense.

     W-1 then contacted CC-1. During their conversations, CC-1 asked W-1 whether the money being transferred was "kosher" and whether anyone would "ask for the money back." CC-1 also explained that the bank account was in the name of CC-1's spouse, who was not Russian,

---

account used to receive the transfer can become "burned" and thus no longer useable to the fraudsters.

[3] "[UI]" is used when a portion of a recorded call is "unintelligible."

and therefore nobody would "check it." After their initial conversations, CC-1 provided W-1 with the pertinent bank account information at Russobank in Russia that could receive the money. The bank account was in the name of someone other than Nazarov. CC-1 also told W-1 to write, in the wire-transfer initiation form, that the money was intended for "financial help."

On December 19, 2016, the FBI initiated a wire-transfer of $50,000 in United States funds from a bank account in Washington, D.C., to the bank account provided by CC-1 at Russobank in Russia. The wire-transfer was successful, and CC-1 confirmed that CC-1 received the money. CC-1 then withdrew that money from the bank and sent the following photograph to Nazarov, which Nazarov forwarded to W-1 (the screenshot below was taken from W-1's phone):



W-1 explained to law enforcement that, through his prior experiences working with Nazarov, the cashing-out of the $50,000 by CC-1 (rather than its subsequent transfer via wire to Nazarov in Israel) indicates that CC-1 used an informal money transmitting business (commonly referred to as a "hawala") to ultimately transfer the funds to Nazarov in Israel.[4]  On December 28, 2016, Nazarov sent a WhatsApp message to W-1 confirming Nazarov's receipt of the money in Israel, minus a fee for the transfer.

## THE GOVERNMENT'S POSSITION ON SENTENCING

If the Court agrees that a two-level enhancement for "sophisticated laundering" under U.S.S.G. § 2S1.1(b)(3) applies, the government recommends a sentence of 21 months imprisonment, followed by no supervised release.[5]  Such a sentence is sufficient, but not greater

---

[4] A "hawala" network is a form of money transmitting business, conducted by operators or brokers known as "hawaladars," that operates outside of traditional banking and financial systems and is premised on relationships of mutual trust.  The hallmark of a hawala is the transfer and receipt of the value of currency without the necessity of its actual physical movement.  In its most basic form, a hawala network involves at least two hawaladars.  A customer approaches a hawaladar and gives the hawaladar a sum of money to be transferred to the beneficiary in another city/country.  The hawaladar then contacts a hawaladar in the recipient city/country, instructs this individual to deliver equivalent funds, minus a fee, in the recipient country's currency to the beneficiary, and promises to settle the debt between the two hawaladars at a later time.  The hawaladar in the recipient city/country then contacts the beneficiary, confirms that the beneficiary is expecting the funds and the funds are delivered to the beneficiary.  The beneficiary/recipient of the funds typically receives the funds without producing identity documents.  In a hawala system there is no recorded agreement or written contract for the transaction and no legal means of reclamation.  Rather, the deal is secured by the trust between the parties which is often forged through familial, ethnic, religious, regional, and/or cultural bonds, and which undergirds the "honor system" that the hawala requires.  A hawala network can be quite extensive, involving the transfer of many types of currencies between various hawaladars in different cities/countries and across different continents, with the value of the money moving in a variety of directions from one city/country to another.  *See, generally,* https://www.treasury.gov/resource-center/terrorist-illicit-finance/Documents/FinCEN-Hawala-rpt.pdf (last checked February 15, 2018).

[5] If the Court finds that this two-level enhancement does not apply, the Government will be requesting a sentence at the mid-point of the resulting Guidelines range, which would be 15

than necessary, to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct.

### A. Sentencing Guidelines Calculation

The Presentence Report ("PSR") writer calculated the following Offense Level and Criminal History Score:

| | | |
|---|---|---|
| U.S.S.G. § 2S1.1(a)(2) | Base Offense Level | 8 |
| U.S.S.G. § 2B1.1(b)(1)(D) | Specific Offense Characteristics (Amount Greater Than $40,000) | 6 |
| U.S.S.G. § 2S1.1(b)(2)(B) | Conviction under 18 U.S.C. § 1956 | 2 |
| | Total | 16 |

The PSR writer then subtracted 3 levels for acceptance of responsibility, resulting in the defendant having a Total Offense Level of 13. Because the defendant has no United States criminal convictions, his Criminal History Score is I. Accordingly, the PSR writer calculated Nazarov's Sentencing Guidelines Range as being 12-15 months.

The Government disagrees with this calculation and believes the 2 level enhancement under U.S.S.G. § 2S1.1(b)(3) applies because "the offense involved sophisticated laundering." The government addresses its contention that this 2- level enhancement applies below.

### B. The Factors Under 18 U.S.C. § 3553(a)

#### 1. Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

Generally, money laundering involves hiding criminally derived proceeds or making

---

months. The government is also not seeking supervised release because, pursuant to the United States' extradition treaty with Israel, the defendant can apply to transfer his prison sentence to Israel, where he will serve such sentence.

criminally derived money appear legitimate. Money laundering is a major concern to law enforcement because it not only hides the proceeds of crime, but also facilitates the commission of serious crimes, such the significant fraud committed by Persons A, B, C, and others on Company 2. Without having a way to transfer the proceeds from fraudulent schemes without being detected by law enforcement or being stopped by banks, those fraudulent schemes often cannot occur.

In this case, the defendant engaged in a sophisticated form of money laundering. Rather than receive the money the defendant was owed from the fraud scheme directly from W-1 into his own bank account in Israel, Nazarov required W-1 to transfer the funds into the third person's account in another country – Russia. Russia was a country wholly unconnected to either the fraud scheme or the locations of either W-1 or Nazarov. According to Nazarov's own words captured on audio-recordings, Nazarov told W-1 to send the funds through his "man in Russia" because, the third party had an account that was capable of receiving money that was not "kosher." The government submits that this was an important feature of the bank account used to receive the money, since opening bank accounts cost money, time, and effort, and one stopped transaction can "burn" a bank account and otherwise render that account unusable for future money laundering activity. In fact, CC-1, in a recorded call with W-1, stated that the bank account in Russia could safely receive W-1's wire transfer because that account was in CC'1's spouse's name, who was not Russian, and therefore nobody would "check" the transfer.

The defendant and others then engaged in an additional piece of layering regarding the funds as part of the money laundering conspiracy. Rather than have the money wire-transferred from the Russian bank account to Nazarov's Israeli bank account, Nazarov had CC-1 use a hawala network to transfer the funds in cash to the defendant in Israel. This form of money transfer

rendered the transmission virtually untraceable. In fact, because the defendant used a hawala, the wire transfer by the defendant looked as if it had only one step – a transmission of money to a bank account in Russia – rather than at least a two-step process whereby the money was ultimately delivered to Nazarov in Israel. Moreover, the use of the hawala network would have necessarily required CC-1 to coordinate with Nazarov or a third party to negotiate the transfer of the funds from Russia to Israel, since the money was delivered in cash to Nazarov. Furthermore, as part of the money laundering scheme, the hawaladar used to transfer the money from Russia to Israel took a share of the proceeds.

Beyond laundering the funds at question here, the defendant also served the key role of "arbiter" in the attack on Company 2. Fraudsters, such as Persons A, B, and C, cannot settle disputes with others involved in their frauds through traditional means, such as by calling the police or filing a civil suit. They must, instead, have their own system of settling disputes. The evidence from the investigation showed that Persons A, B, and C's enforcement mechanism was an Israeli crime family backing their operation. That crime family interceded when W-1 did not distribute the proceeds of the BEC attack on Company 2. Similarly, when W-1 did not transfer the proceeds of the attack because it was intercepted by law enforcement, Nazarov stepped-in and began serving as an "arbiter," keeping the Israeli crime family at bay while ensuring the crime family that W-1 would eventually give them the money they were owed.

The two roles played by Nazarov – that of money launderer and arbiter – show what an integral role he played, and intended to play, in an international cyber fraud. For these reasons, the government maintains that a prison-only sentence at the mid-point of the Sentencing Guidelines range (under the Government's calculation, 21 months) is appropriate and will reflect

9

the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.

### 2. Need to Afford Adequate Deterrence to Criminal Conduct

As noted above, money laundering is used to fuel serious fraudulent schemes, such as the multi-million dollar attack on Company 2.  Money laundering, at its core, is the criminal's way of ensuring that crime pays.  Such behavior can be lucrative and, if sophisticated money laundering techniques are employed, can go entirely undetected.  Because such fraudulent schemes can involve millions of dollars, would-be fraudsters might be tempted to take a risk and agree to receive the proceeds of such schemes through the laundering of funds.  A sentence of jail time at the mid-point range of the U.S.S.G. would help deter such would-be fraudsters and money launderers from engaging in these types of activities and would send the message that engaging in such conduct is not worth the risk.  In addition, the sentence of imprisonment suggested by the Government would deter would-be international fraudsters from attempting to use the United States' banks to further their criminal enterprises.

### 3. History and Characteristics of the Defendant

At the outset, the government notes that the defendant consented to his extradition to the United States.  In addition, upon arriving in the United States, the defendant agreed to waive any detention hearing and agreed to plead guilty.  The defendant's conduct in this regard saved the government, and the Court, time and resources.

However, the government has concerns about the defendant's forthrightness in his PSR. For instance, in the PSR, the writer notes that the defendant worked from 2012 until his arrest in this case in 2017 for a commercial cleaning company, earning $1,700 to $2,000 a month, yet cannot

recall the name of that company.  *See* PSR at ¶ 81.  The defendant also could not recall the name of a construction company he worked for in Israel from 1992 to 2012, and which paid him $2,000 per month.  *See* PSR at ¶ 82.  The defendant also did not know how much he paid for his home in Israel, and was not sure how much money he has in his bank account, yet has the ability, as the PSR writer notes, to hire retained counsel.  *See* PSR at ¶¶ 85-88.

As stated above, a sentence of 21 months is appropriate in this case for several reasons.  First, the defendant placed himself in the middle of a dispute between known fraudsters – W-1, Persons A, B, and C, and a known Israeli organized crime family.  Second, he undertook direct actions to engage in the dispute, using his influence to directly interact with members of the Israeli crime family and to pressure W-1 to transfer the fraud proceeds back to Israel.  Third, once W-1 informed the defendant that $50,000 was available from the fraud, the defendant set-up a sophisticated transfer mechanism to receive that money in Israel, employing a bank account in Russia in the name of a third party and a hawala network transfer system – all for one transfer of $50,000 in funds.

## APPLICABILITY OF THE 2-LEVEL ENHANCEMENT
## FOR SOPHISTICATED LAUNDERING

The government argues that a two-level enhancement for "sophisticated laundering" under U.S.S.G. §2S1.1(b)(3) applies in this case.  Under § 2S1.1(b)(3), if a defendant was convicted under 18 U.S.C. § 1956, as Nazarov was here, and "the offense involved sophisticated laundering," then the defendant's base offense level should be increased by two levels.  The government posits that Nazarov's conduct constitutes "sophisticated laundering" under the Sentencing Guidelines, thereby necessitating the two level increase in his offense level under U.S.S.G. §2S1.1(b)(3).

The commentary to U.S.S.G. § 2S1.1 defines "'sophisticated laundering' [as] complex or

11

intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense." U.S.S.G. § 2S1.1, cmt. n.5(A).  The commentary states that sophisticated laundering "typically involves the use of: (i) fictitious entities; (ii) shell corporations; (iii) two or more levels (i.e., layering) of transaction, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or (iv) offshore financial accounts." *Id*. These examples – which the commentary describes as "typical[]" of sophisticated laundering – are merely illustrative, and are not prerequisites for imposing the enhancement.  In fact, none of these factors need be present for the sophisticated laundering enhancement to be applied.  *United States v. Fish*, 731 F.3d 277, 280 (3d Cir. 2013); *see also United States v. Noel*, 502 Fed. Appx. 284, 290 ("[E]ach of a defendant's individual actions need not be sophisticated to warrant a sophisticated means enhancement.").  Rather, the sophisticated means enhancement applies anytime "the scheme is complex or intricate." *Id*.  Whether a defendant's conduct satisfies this definition requires his "scheme to conceal or disguise" illicit proceeds to be "viewed in its entirety." *United States v. Charon*, 442 F.3d 881, 892 (5th Cir. 2006).[6]

While the Court does not need to find the existence of any of the factors listed in the commentary to § 2S1.1 to find that the "sophisticated laundering" enhancement applies, the

---

[6] In assessing whether Nazarov engaged in "sophisticated laundering" under U.S.S.G. § 2S1.1(b)(3), the Court should analyze not only Nazarov's conduct but also the conduct of his his co-conspirator, CC-1, because Nazarov was convicted of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).  The enhancement here applies where "the *offense* involved sophisticated laundering," U.S.S.G. § 2S1.1(b)(3) (emphasis added), which includes consideration of all reasonably foreseeable actions of others involved in the scheme, *see United States v. Pizano*, 421 F.3d 707, 733-34 (8th Cir. 2005); *United States v. Miles*, 360 F.3d 472, 482 (5th Cir. 2004); *see also* U.S.S.G. §§ 1B1.1 cmt. n.1(H), 1b1.3.  In this case, not only was CC-1's conduct foreseeable to Nazarov, but Nazarov knew about CC-1's receiving of the wire transfer in Russia and then transferring the money to Nazarov in Israel via a hawala.

12

Government notes that at least *two* of those factors are present here – specifically, "layering" and use of an "offshore account."

### 1. **Nazarov's Money Laundering Involved Layering**

The commentary defines "layering" as "two or more levels … of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate." U.S.S.G. § 2S1.1, cmt. n.5(A)(iii). Nazarov engaged in layering by putting W-1 in touch with CC-1 in Russia to receive the initial wire transfer. CC-1 then instructed W-1 to wire the money from a personal rather than a business account, and to state in the wire-transfer request form that the reason for the transfer was "financial help." W-1 then wire-transferred that money from a personal account in the United States to an account in Russia (that was in the name of someone other than Nazarov). CC-1 then withdrew that money and used a hawala to transfer the funds from Russia to Nazarov in Israel. This second layer of the transaction involved the use of a virtually untraceable form of money transference, thus concealing the source and transfer of the funds altogether.

Layering is paradigmatic sophisticated laundering because it hampers the detection of laundering operations. *United States v. Pizano*, 421 F.3d 707, 728 (8th Cir. 2005) ("[T]he sophisticated laundering enhancement now accounts for the harm that befalls society when law enforcement's efforts to track the ill-gotten gains are impeded by layering."). Indeed, the existence of layering alone, even without indicia of complexity, suffices as a basis for the enhancement. *See id*. at 731 ("Under the plain language of § 2S1.1, layering constitutes sophisticated laundering."); *United States v. Miles*, 360 F.3d 472, 482 (5th Cir. 2004) ("When an individual attempts to launder money through 'two or more levels of transactions,' the commentary

13

clearly subjects an individual to the sophisticated laundering enhancement."); *United States v. Suraneni*, No. 08-17209, 2009 WL 2893211 (11th Cir. Sept. 10, 2009) (holding layering and the use of a shell corporation to conceal the source of funds was sophisticated laundering).

### 2. Nazarov's Money Laundering Utilized an Offshore Financial Account

Nazarov also used an "offshore financial account" as part of his money laundering scheme. U.S.S.G. § 2S1.1, cmt. n.5(A)(iv). As stated in the PSR, Nazarov admitted that he maintains a bank account at Mizrahi bank in Israel. *See* PSR at ¶ 86. Rather than receiving W-1's wire transfer directly at that bank account in Israel, or to a Western Union office or to another bank in Israel, Nazarov decided instead to place W-1 in touch with his "man in Moscow" who could provide a bank account that could receive a wire transfer that was not "kosher." This use of an offshore bank account, alone, allows for use of the sophisticated laundering enhancement.

### 3. Viewed in its Entirety, Nazarov's Money Laundering was Complex and Necessitates the Use of the Sophisticated Laundering Enhancement

Beyond the presence of two of the factors discussed above – layering and offshore accounts – Nazarov's money laundering, when viewed in its entirety, is sufficiently complex to warrant the enhancement's application. This is clear from a review of cases applying that enhancement. For instance, in *United States v. Fish*, a cooperating witness acting under the supervision of law enforcement sought the defendant's help in laundering illegal proceeds. *Id*. at 278. The defendant agreed to launder the funds and conducted 12 "check-for-cash" transactions. *Id*. The cooperating witness provided the defendant with checks made out to certain charitable organizations and rabbis, and the defendant gave the cooperating witness cash, less a 10% commission. *Id*. The defendant then made efforts to conceal the money laundering scheme by instructing the cooperating witness to use SIM cards, to sweep his car for detection devices, and

14

to use code when speaking. *Id*. The district court found that the sophisticated laundering enhancement applied, and the Court of Appeals affirmed.

The conduct in this case is similar to *Fish*, but even more sophisticated. In this case, as in *Fish*, a cooperating witness, W-1, approached the defendant and indicated that W-1 could send the defendant a portion of money owed him from the implementation of a fraud scheme. As in *Fish*, Nazarov used at least one third party to funnel the money. In *Fish*, the delivery of the funds was hand-to-hand transfer of a check. Here, at the defendant's direction, W-1 was instructed by CC-1 to wire transfer the money to Russia (i.e., to an "offshore" account). Nazarov also had all of the communications go directly between W-1 and CC-1, keeping himself out of their discussions. CC-1 then requested that W-1 initiate the wire transfer from a personal, rather than a business, bank account, to an account in Russia. CC-1 then instructed W-1 to state that the wire-transfer was for "financial help," and the wire-transfer went to an account at Russobank in the name of someone other than Nazarov. Moreover, in *Fish*, upon receiving the checks, the defendant handed over cash, less his commission. In this case, upon receiving the wire-transfer from W-1, CC-1 used a hawala network, that may or may not have involved other individuals, to transfer the $50,000 in cash to Nazarov in Israel, taking out a fee.[7]

Similarly, in *United States v. Charon*, 442 F.3d 881, 884 (5th Cir. 2006), the Court of Appeals affirmed the District Court's finding that the sophisticated laundering enhancement applied where the money laundering at issue was less complex than Nazarov's conduct here. In *Charon*, the defendant used a cashier's check in a third party's name as the down payment on real

---

[7] The government does not have any insight into the identities of the hawaladars in this particular transaction.

15

estate.  The cashier's check was funded by drug proceeds.  *Id*.  On appeal, the defendant challenged the sophisticated laundering enhancement, arguing that his conduct was not "complex or intricate" because it involved only two levels of laundering, i.e., giving a third party cash from his drug proceeds, having the third party obtain a cashier's check in the third party's name, and then using that check as a down payment on a piece of property."  *Id*. at 891-91.  The Fifth Circuit affirmed, holding that the district court had not clearly erred in applying the enhancement.  *Id*. at 892.  Quoting from a previous decision, the Fifth Circuit in *Charon* stated, "we held that 'when an individual attempts to launder through 'two or more levels of transactions,' the commentary *clearly subjects* an individual to the sophisticated laundering enhancement.'"  *Id*. (quoting *Miles*, 360 F.3d at 482) (emphasis in original).  The Court also quoted the Eighth Circuit, which "determined that 'under the plain language of § 2S1.1, *layering constitutes sophisticated laundering*…. The guideline does not require a finding that each layer was composed of a complex transaction."  *Id*. (quoting *Pizano*, 421 F.3d at 731) (emphasis in original).  In our case, Nazarov not only engaged in layering, but also utilized an offshore account in an entirely different country in a third party's name, and then had the money sent through a hawala network to receive the funds in cash in Israel.

Likewise, in *United States v. Galdos*, 308 F. App'x 346 (11th Cir. 2009) (unpublished), defendant Galdos was convicted of laundering proceeds from a health care fraud operated by an acquaintance.  Initially, Galdos simply deposited checks from the acquaintance and returned the proceeds in cash.  Later, at the acquaintance's direction and using an incorporation service operated by the acquaintance's wife, Galdos submitted an online application to incorporate a shell corporation.  Thereafter, the acquaintance gave Galdos checks made out to the new shell

16

corporation.  As before, Galdos deposited the checks and returned the proceeds in cash.  308 F. App'x at 352-53.  On appeal, the Eleventh Circuit found that the district court had not erred in applying the sophisticated laundering enhancement.  Like *Galdos*, the present case involved passing funds through a bank account to disguise their source.  *Galdos*, however, did not involve wire transfers, an international bank account, sending the proceeds to a destination different from their original source, or the use of a hawala network following the international wire transfer.

Three cases where Courts declined to impose the sophisticated laundering enhancement – *United States v. Eckstein*, *United States v. Maddox*, *United States v. Jarrett* – exhibit why Nazarov's money laundering conspiracy was, indeed, sophisticated in nature.  In *Eckstein*, an FBI confidential human source identified a cocaine distributer in New Mexico.  No. Cr 12-3182 (JB), 2016 WL 546663, at *1 (D.N.M. Feb. 3, 2016).  The FBI conducted three one-kilogram purchases of cocaine and a controlled purchase of eight ounces of cocaine, and numerous multi-pound purchases of marijuana.  *Id*.  The investigation revealed that defendant Eckstein laundered the drug proceeds through his car wash and real estate businesses.  *Id*.  The court noted that "Eckstein "did not own, list or create fictitious entities as part of the money laundering scheme," but rather an undercover person "provided Eckstein with the names of apparently fictitious entities, which Eckstein paid with checks that his own legitimate companies issued." *Id*. at *8.  The court held that the enhancement for sophisticated laundering did not apply.  *Id*.

In *Eckstein*, the defendant also did not any use offshore bank accounts, as did Nazarov in the present case.  Rather, in *Eckstein*, the defendant paid all of the money directly from businesses that he owned to the bank accounts provide by the undercover person.  Also, in *Eckstein*, the defendant did not engage in any layering, as Nazarov did here.  All of the money the defendant

17

transmitted in *Eckstein* went directly from the defendant in the United States to the undercover person, who was also located in the United States. The absence of any offshore accounts or layering by the defendant in *Eckstein* – while not dispositive of the issue of sophisticated laundering, *see Fish*, 731 F.3d at 280 – explains why Nazarov's laundering activities were sophisticated.

Similarly, in *United States v. Maddox*, Crim. No. 14-20-DLB-EBA, 2016WL445246 (E.D. Ky. Aug. 23, 2016), the court found that the sophisticated laundering enhancement did not apply where "[a]ll of [the defendant's] businesses operated in his or his wife's name" and "[t]hey never attempted to hide money or to 'clean' otherwise dirty money." *Id*. at *5. In Nazarov's case, he used a bank account in the name of CC-1's spouse – not his own name – and clearly meant to hide the money by having it reach him through a wire transfer to Russia followed by a hawala transfer to Israel. Furthermore, in *Maddox*, the court noted that, "[a]lthough [the defendant] sent some money overseas, it was for purchasing cigarettes and not to disguise or otherwise make the money difficult to trace…" *Id.* In the present case, however, Nazarov clearly had the money transferred to Russia to make the money difficult to trace. Moreover, in *Maddox*, the court noted that there was no evidence of any "layering" because "[t]here was only one level of transfer that was intended to make the money seem like something that it was not," whereas in Nazarov's case there was clearly layering.

Likewise, in *United States v. Jarrett*, No. 1:03-CR-087, 2011 WL 6044475, (N.D. Ind. Dec. 5, 2011), the court found no sophisticated laundering where: (1) the entity involved in laundering the money was not fictitious, and (2) the defendant received drug proceeds, placed them into that company's bank account, and then paid drug dealers from that same account. *Id.* at *5.

18

Unlike Nazarov, the defendant in *Jarrett* did not engage in any layering nor did that defendant use any offshore accounts. *Id*. at *5.

The guideline enhancement does not require that the Nazarov's money laundering scheme be the most sophisticated scheme possible. It does not even require that the scheme be "highly" or "unusually" sophisticated. It requires only that, in the formed judgment of the sentencing court, the money laundering be sophisticated. In aid of that determination, the guideline commentary provides several non-exclusive factors to consider, at least two of which exist in this case. Based on the foregoing, the government respectfully requests that the Court apply the two level sophisticated laundering enhancement under §2S1.1(b)(3).

## FORFEITURE

As part of his plea agreement, the defendant agreed to the entry of a forfeiture money judgment for $50,000.

## RESTITUTION

The government will not be requesting restitution in this case. *See, e.g., United States v. Cottman*, 142 F.3d 160, 169 (3d Cir. 1997) ("investigative costs and voluntary expenditures by the government to procure evidence are not losses").

## CONCLUSION

For the reasons described above and in the PSR, the government's recommended sentence in this case reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, and afford adequate deterrence as set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

JESSIE K. LIU
United States Attorney
D.C. Bar No. 472845

By:       /s/
MICHAEL J. MARANDO, N.Y. Bar No. 482850
DIANE G. LUCAS, D.C. Bar No. 443610
DAVID B. KENT, D.C. Bar No. 482850
Assistant United States Attorneys
(202) 272-7068 (Marando)
(202) 252-7724 (Lucas)
(202) 252-7762 (Kent)
Michael.Marando@usdoj.gov
Diane.Lucas@usdoj.gov
David.Kent@usdoj.gov