```
1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2

3

4

5    UNITED STATES OF AMERICA,   )
                                 )
6         Government,            )
                                 )
7         v.                     )   Criminal No. 17-018
                                 )
8    STANISLAV NAZAROV,          )
                                 )   Washington, D.C.
9         Defendant.             )   March 5, 2018
     _____)
10

11

12             TRANSCRIPT OF SENTENCING HEARING

13        BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY

14             UNITED STATES DISTRICT JUDGE

15

16

17

18

19   Court Reporter:

20   Richard D. Ehrlich, RMR, CRR
     Official Court Reporter
21   United States District Court
     333 Constitution Avenue, NW
22   Washington, D.C. 20001
     (202) 354-3269
23

24   Proceedings reported by stenotype.

25   Transcript produced by computer-aided transcription.
```

```
1                        A P P E A R A N C E S

2

3

4    For the Government:    MICHAEL JOHN MARANDO
                            DIANE G. LUCAS
5                           DAVID KENT
                            U.S. ATTORNEY'S OFFICE
6                           555 Fourth Street, NW
                            Washington, D.C. 20530
7                           (202) 252-7724

8

9
     For The Defendant:     DOROTHY AMES JEFFRESS
10                          KAITLIN BROOKE KONKEL
                            ARNOLD & PORTER KAY SCHOLER, LLP
11                          601 Massachusetts Avenue, NW
                            Washington, D.C. 20001
12                          (202) 942-5968

13

14

15   Defendant, Stanislav Nazarov, present in person.

16

17

18

19

20

21

22

23

24

25
```

```
 1                 THE COURT:  All right.  Call the case.
 2                 THE CLERK:  Criminal Case 17-018.  The United
 3      States vs. Stanislav Nazarov.
 4                 Counsel, would you please identify yourselves for
 5      the record?
 6                 MR. MARANDO:  Good afternoon, Your Honor.  Michael
 7      Marando with Diane Lucas and David Kent on behalf of the
 8      Government.
 9                 THE COURT:  All right.  Good afternoon.
10                 MS. JEFFRESS:  Good afternoon, Your Honor.
11      Amy Jeffress with Katlyn Kunkle for Mr. Nazarov.
12                 THE COURT:  All right.  Good afternoon.
13                           INTERPRETER, SWORN
14                 THE COURT:  All right.  Mr. Nazarov, as I've told
15      you before, if for some reason you can't hear what's going
16      on, sometimes the battery dies, or if you don't understand
17      what the interpreter is telling you, please get our
18      attention.  All right?
19                 He's nodding "yes."
20                 All right.  We're here for a sentencing.
21      Mr. Nazarov pled guilty to conspiracy to commit money
22      laundering.  The statutory penalties are a maximum 20 years
23      in jail, maximum $500,000 fine, or two times the value of
24      the monetary instruments at issue.
25                 What I have is a presentence report with an
```

1    amendment addressing the enhancement for sophisticated

2    laundering, which is the sentencing guidelines

3    Section 2S1.1(b)(3).

4         I also have a Government memorandum in aid of

5    sentencing, the defendant's memorandum in aid of sentencing,

6    which includes letters of support from his children, his

7    parents, and a member of the community.  I also have a

8    letter from Mr. Nazarov's mother's treating physician.

9         In terms of objections, the only objection in the

10   presentence report relates to his birthdate, which is listed

11   as March 12th, and they indicate that his other date is

12   December 3rd.  What has been brought out is that -- and he

13   claims it's March 12th -- is that it could be the European

14   way of giving dates where they give the day before the month

15   in some countries.  Probation is not in a position to change

16   it because it came from NCIC.  It will be certainly noted

17   for the record that there's a possibility that they've

18   inverted the date and the day and the month.

19        Now, the Government did not initially raise the

20   request for a two-point enhancement for sophisticated

21   laundering as I would've expected them to do, but they

22   didn't.  It was briefed, however, in both of the sentencing

23   memoranda.  It had been raised as a potential issue in the

24   plea agreement itself.  So I asked probation to consider it

25   and give me a recommendation, which they did.  Part of the

1  reason I asked is that there was not a lot of information,

2  frankly, in the sentencing guidelines or otherwise relating

3  to this enhancement, so I, not the Government, asked for it.

4  I wanted to see whether they had another view of it or could

5  provide some additional information, and they did give me a

6  recommendation.  They didn't add any new information to what

7  the Government had already argued.  So I basically had

8  whatever arguments were going to be made between the

9  Government and the Defense.

10      I did issue a written opinion in advance of the

11  sentencing, frankly, to inform the parties of my position so

12  you wouldn't come in and find out what position I was

13  taking, and I did find that the enhancement applied based on

14  my own analysis.  I think I relied on a case the Government

15  might have cited.  I did go over the defendant's argument in

16  the original opinion.  Defendant objected to my request from

17  probation and argued the Government had waived it.  I would

18  point out they didn't ask for it, I did.  Certainly making a

19  decision, I can seek the opinion of the probation

20  department, especially where I didn't have a lot of

21  information, and they did put it as an addendum.  So I

22  wasn't getting information that was not going to be shared

23  with both counsel.

24      I did postpone the sentencing from Friday to

25  Monday.  I realized that that might've created some problem

1    with somebody who was planning on coming, but I am in trial,

2    and there's just not enough time to try and respond to what

3    you filed.  You also indicated that you wanted to have an

4    opportunity to have oral argument, and I was not going to be

5    able to do that on Friday as well as consider what you had

6    actually filed.  So I moved it to Monday to make sure that I

7    could look through what had been filed, and also today was

8    an easier day to give you an opportunity to speak than it

9    was on Friday.

10            So let me ask at this point, Ms. Jeffress, have

11   you go ahead and address it, and whomever from the

12   Government wishes to address it can respond.

13            MS. JEFFRESS:  Yes.  Thank you, Your Honor.  We do

14   appreciate the Court's rescheduling the hearing so promptly

15   because Mr. Segev, who was able to come, was able to

16   postpone his flight.  He had to move a court hearing that he

17   was supposed to start today in Israel in order to do that,

18   but he was able, with some pushback from a judge in Israel,

19   to move his matters.  So he is able to be present today.

20            THE COURT:  All right.

21            MS. JEFFRESS:  We do appreciate the Court

22   rescheduling the matter so promptly because we were, of

23   course, aware of --

24            THE COURT:  I appreciate you working with my

25   schedule, too.

1          MS. JEFFRESS:  Thank you, Your Honor.

2          Your Honor has set forth what has happened and our

3    objection.  Just to clarify, one of the reasons for the

4    objection was that the addendum that the probation officer

5    wrote says that the Court requested the probation office

6    respond to the Government's position regarding the two-level

7    adjustment, and then the addendum addresses the Government's

8    arguments, but the addendum does not address any of the

9    defendant's arguments.

10          THE COURT:  Let me just say, there may have been a

11    misunderstanding.  I did not do an order.  We had a

12    telephone conversation.  My law clerk spoke first, and then

13    I got on the phone.  I had intended certainly that they look

14    at the two memoranda because that would have whatever the

15    arguments were, but I didn't do a minute entry, which might

16    have made it clearer.

17          Anyway, these are the arguments that the

18    Government made, and she didn't add anything new.

19          MS. JEFFRESS:  Fair enough, Your Honor.

20          These are the arguments that the Government made,

21    so it was of concern to us that it didn't appear, at least

22    from this, that the probation officer had considered the

23    arguments that the Defense had made.  And then, moreover, we

24    had not had an opportunity to respond to the arguments that

25    had been made in the Government's memorandum in aid of

1    sentencing, and so we were surprised that the Court would go

2    ahead and issue findings on the two-point enhancement

3    without hearing our position on what the Government had to

4    say.

5            THE COURT:  You never set up a reply date.  I

6    mean, let me just say for posterity, what I would do -- we

7    set a very tight schedule, which was requested, which was

8    probably not a good idea of mine to do this in the middle of

9    the trial.  But at any rate, since he's been held for such a

10   long period, we had set it up with a quick turnaround.  We

11   never set a reply date.  Usually I do if people want it.

12   Nobody said anything.  I thought it would be better for you

13   not to come in and find out what I thought.

14           But at any rate, go ahead.  We now have everything

15   on the record.  I'll give you an opportunity to respond.

16           MS. JEFFRESS:  We appreciate that, Your Honor.

17   And as the Court noted, had the Government commented on the

18   failure to include the two points at the outset when the

19   first draft presentence report came out, then we would've

20   had the opportunity for that back and forth, which is what

21   Rule 32 prescribes.  So what felt unfair to the Defense was

22   the lack of an opportunity to respond to the Government's

23   arguments, and one argument in particular that we disagree

24   with is that the defendant could have transferred the wire

25   transfer that witness 1 sent him to his account in Israel

1   unless he was trying deliberately to send it to Russia in

2   order to conceal it.

3            And as we wrote in our response to the Court's

4   order, the defendant has a bank account in Israel, and that

5   account is used for direct payments from his employer and

6   for other purposes, but he does not have the familiarity

7   with the banking system, does not even know whether it's

8   possible for that account to receive funds from overseas.

9   It's not set up to receive funds from overseas, and so he

10  did not really have any understanding -- and the Court's

11  welcome to question him on that if the Court wishes to do

12  so -- he did not understand that he could transfer money

13  from the United States into that account.  He had never

14  previously received funds from overseas to that account.  So

15  he had the money sent to a contact in Russia because that's

16  where he does have contacts who he knew could receive the

17  funds, and that's the way he set it up.  It then came to him

18  in cash through the hawala transfer.  And we don't disagree

19  with the Government's account of the facts there, we just

20  disagree with the Government's interpretation of what those

21  facts represent in terms of his state of mind and what he

22  intended to do.  He intended to receive the money which he

23  knew was being paid to him.  I mean, he didn't know it was

24  actually undercover funds.  So I should say he thought it

25  was money being paid to him for his role in the fraud that

1    he and witness 1 had agreed that he would be paid for prior

2    to this transfer taking place in December 2016.

3              THE COURT:  Okay.  Anything else?

4              MS. JEFFRESS:  That's all.

5              THE COURT:  Is there anything you wish to correct,

6    whoever it is that's going to speak?

7              MR. MARANDO:  Your Honor, just very briefly, and I

8    won't belabor these points.  First, regarding our raising of

9    this enhancement, the two-point enhancement, it was in our

10   plea agreement that we would raise this, and we believe that

11   this enhancement applied.  In addition, Ms. Jeffress did

12   address it in her own sentencing memorandum.

13             THE COURT:  Let me just say that if you have an

14   objection, since they didn't include it, you should include

15   it.  You should make the objection to give the probation

16   department an opportunity to weigh in.  If you don't raise

17   it, generally I, and most judges, may ask them to come in

18   and weigh in, which puts the process a little out of kilter

19   because it's not done as part of the -- before I get it, you

20   make objections, they look at it, they decide whether they

21   agree with it or not, and then it comes to me either

22   resolved or not.  So in the future, if you've got an

23   objection to -- it was prepared without the enhancement, you

24   should've said something.

25             MR. MARANDO:  Yes, Your Honor.

1          Just related to Ms. Jeffress' point, Your Honor,

2     that the defendant does not have the familiarity with the

3     banking system in Israel to make the transfer.  The

4     Government would take issue with that contention.  It is the

5     Government's position that Mr. Nazarov is more than familiar

6     with numerous ways in which to transfer money from the

7     United States and then receive that money in Israel, and the

8     Government could've provided additional evidence of that if

9     the Court so wishes, Your Honor.

10          Other than that, Your Honor, we have no other

11     objections or corrections to what Ms. Jeffress said.

12          THE COURT:  All right.  Let me take a break and go

13     back briefly to look over what you've said and to check

14     something.  I did go back and look at the unofficial --

15     shall we say the unofficial transcript of his statement that

16     he made of the offense since there was a broader

17     presentation and a much narrower one that he actually agreed

18     to.  So I did go back.  Let me look at a couple things, and

19     I'll be right back out, and I'll tell you where I am.

20          (Break.)

21          THE COURT:  All right.  I did have an opportunity

22     over the weekend to look at and review, again, the arguments

23     that Ms. Jeffress has raised, which she has focused on in

24     her oral argument.  I disagree with her.  I'm going to put

25     out a written order.

1          This is a complicated area, and trying to explain

2    it orally is not going to be a complete explanation, so I'm

3    putting out an order that indicates my view of how this

4    works.  And I think that he's agreed, he knew the funds were

5    illegal, and it's an objective standard in terms of looking

6    at what actually was done in terms of transferring the

7    money, which is what I've reviewed.  So at this point, I

8    will be adding the two points for sophisticated laundering.

9    You obviously have your objections on the record, both in

10    writing and orally.

11          So let me go forward.  The advisory sentencing

12    guidelines.  The offense level was 14.  Two points for

13    sophisticated laundering.  Two points for being convicted

14    under 18 U.S.C. 1956, which is 18 minus 3 points for

15    acceptance of responsibility puts him in offense level 15.

16          Criminal history.  He's in criminal history

17    category No. 1.  He has no convictions in the United States.

18    He has one prior conviction in Israel in 2005, which was a

19    suspended seven-month sentence and a fine.  Possession of

20    illegal drugs, attempting to receive an item fraudulently,

21    and possession forged money notes, but he still is in

22    category 1.

23          The advisory sentencing guideline range under

24    those circumstances in terms of custody is 18 to 24 months.

25    Supervised release is 1 to 3.  I think everybody agrees that

1    since he is going to be deported, that it makes no sense to

2    put in a supervised release, and I would agree.

3            He's ineligible for probation.  The fine is $5,500

4    to $500,000.  Restitution is not applicable.  The special

5    assessment is $100.

6            So for those parts of the presentence report that

7    are undisputed, my findings are pursuant to the Federal Rule

8    of Criminal Procedure 32(i)(3)(A).  And for the enhancement

9    of the sophisticated laundering which resolved a dispute,

10   the finding is under Federal Rule of Criminal Procedure

11   32(i)(3)(B).

12           So, at this point, with the addendum, the newer

13   revised presentence report for February 27, 2018, does

14   include the enhancement.  So I would adopt the presentence

15   report as written on February 27, 2018.

16           Now, at this point, I would like to hear from the

17   Government.  A couple of things if both parties would

18   address.  You've recommended, I think, 21.  I wasn't clear

19   whether that was with or without a Smith departure.  Also it

20   wasn't clear to me, is there a plan to have him go to

21   Israel?  And if there is, does that affect in any way the

22   sentencing?

23           MR. MARANDO:  Your Honor --

24           THE COURT:  I'll let you do your allocution.  I'm

25   just throwing those things out as I would like an answer to

1    them.

2          MR. MARANDO:  My sincerest apologies, Your Honor.

3    I missed your second question.

4          THE COURT:  Okay.  The second question was under

5    the plea agreement, he can serve it in Israel.  So I don't

6    know whether there's a plan to have him serve it there, but

7    the way they would serve his sentence, I don't know whether

8    -- I've not had this happen before.  So I don't know whether

9    he would serve the sentence I give or they have some good

10   time credit thing or something else.

11         The first question was whether, in the

12   recommendation you made, whether you were doing a Smith

13   departure, which he's getting deported.  So, ordinarily, you

14   know, if he wasn't, there was a possibility he would've been

15   put into the halfway house near the end of his sentence.

16         Those are the questions I had.  I'll give you a

17   moment to confer.

18         MR. MARANDO:  Can I have just the Court's

19   indulgence briefly, Your Honor?

20         THE COURT:  Sure.  No problem.

21         MR. MARANDO:  Thank you, Your Honor, for the

22   Court's indulgence.  I will keep my remarks brief.  I

23   realize that it's been a long day for the Court.

24         Mr. Nazarov's case is part of a larger operation

25   that is before Your Honor with the goal of identifying and

exposing what the Government considers transnational

organized crime.  The case here specifically deals with one

aspect of that, which is money laundering and also the means

in which these sorts of international crimes occur.

As Your Honor is aware and as is stated in the

statement of offense, this case originally came to us

through a business email compromise attack against a company

in the Middle East, the money of which was wired into an

undercover FBI bank account.

Upon receiving that money here in a bank account

in Washington, D.C., we were able to, through the use of

cooperators, identify Mr. Nazarov as what the Government

would characterize as either a quote, unquote, "back" or

"arbiter" for those who engage in these types of activities.

People who admit fraud, such as the people who did

the business email compromise attack on the Middle Eastern

company, oftentimes will have disputes with one another.

For instance, if an attack is successful and the fraudsters

don't get their money -- if they don't get their money, the

fraudsters can't just go to the police and make a police

report or file a lawsuit to recoup their funds.  They have

disputes.  And as Mr. Nazarov even acknowledged in his plea,

he served as an arbiter amongst these groups.

When the $1.4 million was wire transferred into

the account in Washington, D.C., the fraudsters back in

1    Israel were looking for their money.  They wanted to know

2    where their $1.4 million was.

3          Our Government cooperator then engaged in

4    consensually recorded calls with Mr. Nazarov, and we also

5    actually even flew a cooperator to Israel and had the

6    cooperator interact with Mr. Nazarov, which was recorded,

7    and what we saw was the efforts that Mr. Nazarov undertook

8    to keep the Israeli crime family that was backing the

9    fraudsters that committed the fraud away from our cooperator

10   and also to sort of allay their concerns that they will get

11   paid.

12         His actions in that were ongoing, and they spanned

13   months after the money was wired into Washington, D.C.

14         During the time, Mr. Nazarov was consistently

15   imploring our cooperator to get the money from the 1.4 to

16   wire it back to Israel.

17         We then decided to make the representation to

18   Mr. Nazarov that a portion of the $1.4 million was

19   miraculously available and could be transferred to

20   Mr. Nazarov overseas.

21         Mr. Nazarov readily accepted that money and then

22   provided our cooperator and the Government with the means by

23   which to launder that money from the United States to

24   Israel.

25         Now, Mr. Nazarov didn't have the money wired to

1    Israel.  He didn't have it wired to an account in his name

2    in the United States.  He didn't have the money bulk

3    smuggled to Israel.  There were various means by which a

4    person could get money from one country to another from the

5    United States to Israel.

6            What he did do was, first, in the recorded

7    conversations with our cooperator, he asked our cooperator

8    whether or not the money was kosher or not; and if it was

9    not kosher, he said I could send you to my man in Moscow.

10           Now, our cooperator said, Well, the money is

11   kosher in the sense that nobody is going to ask for it back.

12           But Mr. Nazarov still put our cooperator in touch

13   with his quote, unquote, man in Moscow.

14           The man in Moscow, who is co-conspirator 1 in our

15   indictment, contacted our cooperator and gave our cooperator

16   an account at Russobank in Russia in which to send the money

17   to.

18           So the FBI wired the money to Russobank in Russia.

19   Russia is a country that's totally not involved in this

20   fraud scheme at all whatsoever.  In the recorded

21   communications with co-conspirator 1, co-conspirator 1 told

22   our cooperator that this account was safe because nobody

23   would check the account, meaning that nobody would stop the

24   funds from going through.  Then once the money went to

25   Moscow, it was then withdrawn by co-conspirator 1 in Russia,

1    and it was withdrawn into cash.  And I showed you in our

2    sentencing memorandum the screenshot that was said which was

3    the picture of the cash withdrawn.

4         Then it had to get from Russia to Israel.  And the

5    way it did that, again, was not through a wire transfer or

6    other means, it was through a 2000-year-old money

7    transferring system known as hawala, which is virtually

8    untraceable, or, actually, it is untraceable, and that's how

9    the money got from Russia to Mr. Nazarov in Israel minus

10   sort of a 2% fee for the transfer.

11        Mr. Nazarov then, upon getting the money,

12   confirmed that he had it, Your Honor.

13        Based upon what we have exposed here in the

14   Government, Mr. Nazarov's role not only in the fraud, his

15   knowledge of where this money -- where he believed that this

16   money came from, his knowledge of who the Government's

17   cooperator was and the type of business that our cooperator

18   was once involved in, and then his fact of using what the

19   Government and the Court now agrees is a sophisticated money

20   laundering technique by which to make those funds harder for

21   the Government to track and to find, the Government

22   represents and believes that a sentence of 21 months, which

23   is in the midway of the guidelines range, is appropriate.

24        Now, to address Your Honor's questions regarding

25   the Smith departure.  The Government, through our

1   negotiations with Defense counsel, we did not discuss this

2   or address this, Your Honor, and we will defer to the Court

3   on this point, but we do note that through our plea

4   agreement, it has the standard language that no party would

5   be seeking a departure under the guidelines.

6           THE COURT:  I thought they had something in there

7   about -- I don't remember.  A lot of them do, and it may not

8   have -- you certainly would know better than I do in terms

9   of the sentencing.

10          Let me just look.

11          Okay.  It doesn't include anything else.  So my

12  question to you is -- I take it, then, your recommendation

13  for the 21 months doesn't include a Smith departure?

14          MR. MARANDO:  Yes, Your Honor.

15          THE COURT:  Okay.

16          MR. MARANDO:  Regarding your second question, Your

17  Honor, I have been in touch with the Department of Justice

18  Office of International Affairs to work out the mechanics of

19  the sentence.  How this will work is we won't oppose a

20  transfer of the sentence, Mr. Nazarov's sentence, to Israel.

21  I do not know, Your Honor, if there is good time or not.

22          THE COURT:  Or whether they have some other system

23  that would reduce it further is what I'm asking.

24          MR. MARANDO:  I don't know that, Your Honor.  I

25  apologize.  I should've had that answer for today.

1            But how it will work is Mr. Nazarov, through his

2    counsel -- and I will put his counsel in touch with the

3    International Prisoner Transfer Unit, and they will make an

4    application to the International Prisoner Transfer Unit to

5    transfer the sentence to Israel.  And Ms. Jeffress, I spoke

6    with her last week, and she said that she is familiar with

7    this process.

8            THE COURT:  All right.

9            Ms. Jeffress.

10            MS. JEFFRESS:  Thank you, Your Honor.  And we do

11   thank the Court for putting this sentencing on an expedited

12   time frame, and it has been Mr. Nazarov's goal ever since he

13   was arrested in Israel to resolve this case as quickly as

14   possible so that he can return to Israel because, as the

15   Court is well aware, his mother is in very poor health.  So

16   that's always been his goal, and that's always been our

17   position, and the Government is aware of that as well.

18            I'll point out that he consented to extradition in

19   Israel so that he could be extradited as promptly as could

20   be arranged logistically.  Once here, he waived his

21   detention hearing.  Even before he was here, I had met with

22   the prosecutors and informed them that this would likely be

23   a disposition, and we would like them to prepare a plea

24   offer as quickly as possible, and they did that.  They were

25   very responsive; in fact, we were able to negotiate a plea

agreement very soon after the defendant's initial appearance

in late October.  Then Mr. Nazarov promptly agreed to accept

it, and we had the plea hearing in early December, which is

really quite an expedited time frame as these cases go, as I

know the Court is well aware.

I would also say that Mr. Nazarov has been

punished very severely for what he has done in this case.

His extradition and his incarceration at the jail have

involved extreme hardship and more hardship than another

inmate in the jail would suffer, Your Honor, for several

reasons.  Most critically, of course, the separation from

his very ill mother has been emotionally very difficult.

His separation from his wife and his children has been very

difficult as well.  It took almost a month, maybe longer,

for the jail to be able to arrange for him to make phone

calls back to Israel because he speaks no English, and there

was no one at the jail who speaks Russian, which is his

native language, or Hebrew, which he has some conversation

ability in.  So it's been very difficult for him to get any

attention to even very basic requests like phone calls back

home, like medical needs.

The one thing that we talked about more frequently

with him than anything else when we visited him in the jail

is his request for books because there were no books in

Russian at the jail.  Everything is in English, and he can't

read English.

I've never had a client whose main request is, Can you get me something to read because I have no one to communicate with?

But that has been the principal request he has made every time we've seen him.

Once he was able to make phone calls, he did speak with his wife very frequently.  Now and then the phone lines are down, but that's been very important to him, and certainly his mood has been much better since he was able to speak with her because that detachment from his family has been very, very hard for him.

The jail personnel, I don't mean to criticize them, they have been very responsive, and we've been in contact with them, but they are not able to understand him day to day, which is what's made it very difficult, and that's despite their efforts.  The interpreters have been very helpful, and we appreciate their assistance.

Mr. Nazarov has also not complained about anyone treating him unfairly.  He, in fact, has been very complimentary of the marshals, the FBI who were at his booking, and the personnel at the jail who have tried to assist him.  I think this is just a product of very difficult communications issues that have caused him great hardship.

1          So all in all, these limitations have made his

2   months at the jail vastly more difficult than the same

3   period of time would be for other prisoners.

4          So our position is that he deserves the most

5   lenient sentence available under the guidelines and whatever

6   leniency the Court can impose at this time.

7          I would say he has never intended to involve the

8   United States in what he did in Israel.

9          Mr. Marando referred to the possibility of his

10   receiving the money sent by the cooperator to an account in

11   the United States.  Well, he's never had an account in the

12   United States and has never done business with the United

13   States previously.  This case was the result of his being

14   set up by the cooperator to receive this transfer.

15          He is not as involved as some of the defendants in

16   the related cases that I know the Court has seen.  This case

17   was the product of one series of discussions with the

18   cooperating witness, who I think the Government explained,

19   was basically asked who else could he assist in prosecuting,

20   and Mr. Nazarov was identified.  The cooperator proposed to

21   transfer him this $50,000, and Mr. Nazarov agreed to receive

22   that.

23          Apart from that, he's had nothing to do with the

24   United States, and there is no evidence that the Government

25   can point to that he had any involvement with the United

1    States.  He had never been to the United States.  He has

2    never done any business here, nor does he have any intention

3    of doing any business here.  So it's questionable why he was

4    brought here for such a minor role, really, in the offense.

5    But, nevertheless, he has been extradited.  He's accepted

6    responsibility.  He's pled guilty, and now he just wants to

7    return to his family in Israel as soon as possible.

8              So the Court has now found that the two points for

9    sophisticated laundering apply.  Of course, we disagree with

10   that.  We think that this is perhaps one of the most

11   unsophisticated, if not the most unsophisticated, acts that

12   has ever been found to qualify for that guideline.  But,

13   nonetheless, we would ask the Court to take into

14   consideration that as these things go -- and the Court has

15   read the cases.  I know that the Court prepares very

16   thoroughly.

17             THE COURT:  There's very little information on

18   this.

19             MS. JEFFRESS:  Well, there are some --

20             THE COURT:  Some of it is logic.

21             MS. JEFFRESS:  There are some cases, Your Honor,

22   and all of those cases where the enhancement has been

23   applied involve more complex situations than this one.  I

24   think the Court would agree with that.  I know the Court has

25   read some of the cases.  Most of the cases involve multiple

1   transfers and conduct that takes place over the course of

2   time, not really a single transfer of an amount as small as

3   $50,000.

4          So we do disagree with the Government's

5   representations about the seriousness of this offense.  And

6   I would say, Your Honor, that all of the Government's

7   representations just differ from ours because we have a

8   different view of how to interpret the facts in this case.

9   We have no complaint with the Government.  These are all

10  well within the bounds of the adversarial relationship, and

11  they've been very professional to work with, and we

12  appreciate that, but we do take issue with the claim that a

13  serious penalty in this case would contribute to deterrence

14  because this was really an FBI setup.  Mr. Nazarov was not

15  really fooling anyone by transferring FBI money to himself

16  through his associate in Russia, and we don't think that his

17  conduct is particularly sophisticated or serious.  We don't

18  find that this serious penalty in this case really serves

19  the purposes of deterring international fraudsters from

20  attempting to use U.S. banks because, of course, Mr. Nazarov

21  really had no intention of using a U.S. bank.  He just

22  arranged to receive the money coming out of the United

23  States that the cooperator was sending him.  So the party

24  that used the U.S. bank in this case is the FBI, not

25  Mr. Nazarov.  I think that that's very clear, and I don't

1    think the Government would be able to disagree with that.

2           I do want to just clarify.  The Court may remember

3    very well from the plea hearing that there was a

4    disagreement about whether this particular transfer was

5    kosher or not, and the Government did accurately recite one

6    conversation where the defendant said, If it's kosher, we

7    can do it this way; if it's not kosher, we can do it this

8    way.

9           The actual transfer that took place in this case

10   was kosher under their understanding, and that's in the

11   statement of offense.  I don't think that it really matters

12   because he did understand that it was the result of criminal

13   activity.  He was being paid for his role in criminal

14   activity, and he understood that the cooperator was involved

15   in criminal activity.  But it's important for him because

16   what he pled to was transferring it -- agreeing to have it

17   transferred to him through his associate's wife's account in

18   Russia, and he would not have used that particular method

19   had he understood that it would get his associate in

20   Russia or that person's wife in trouble.

21           THE COURT:  You need to slow down.  The court

22   reporter is starting to have problems and the interpreter,

23   I'm sure, as well.

24           A little slower.

25           MS. JEFFRESS:  All right.  I'm almost finished,

1    Your Honor, and I do know the Court has had a long day.

2              THE COURT:  No.  I don't want to cut you short.

3              MS. JEFFRESS:  Okay.  Thank you, Your Honor.  I

4    appreciate that.

5              In any event, the final point that I will make

6    about the facts is that the Government and Mr. Marando, in

7    his allocution just now, have talked about his role as an

8    arbiter.  We would ask the Court not to consider that

9    conduct.  All of that took place in Israel.  It's not clear

10   that it could be charged here.  It's not relevant to

11   anything involving what happened in the United States, and

12   the Israeli authorities have their own investigation into

13   the activities in Israel, so we don't think it's appropriate

14   for the Court to take that into consideration in determining

15   what sentence should he face here in the United States for

16   the conduct that he engaged involving the United States.

17             THE COURT:  I'm not clear about that because I

18   thought part of -- this was an important function that he

19   performed, and he indicated that he did.  I mean, you know,

20   he's being charged with the money laundering, not being an

21   arbiter, but I don't think it's insignificant.  I'm not

22   suggesting guilt by association if that's what you're

23   concerned about.

24             MS. JEFFRESS:  What we're concerned about is the

25   Court sentencing him for the offense that he committed that

1    the United States has jurisdiction over, Your Honor, and

2    that is a simple transfer of $50,000 that he understood he

3    was being paid in connection with his partnership with

4    witness 1.

5            THE COURT:  Okay.

6            MS. JEFFRESS:  Your Honor, we would just also

7    object on two points relating to the defendant's specific

8    situation.  One is that the Government, in its sentencing

9    memorandum, took issue with the representations that he made

10   to the probation officer about his employment, and we have

11   provided the Government with paystubs that he had received.

12   He did not know the name of the company that paid him

13   because he was working for a subcontractor, and that's why

14   he told the probation officer that he didn't remember the

15   company's name.  It's not that he was being dishonest about

16   his employment.  Mr. Segev had actually brought the paystubs

17   with him from Israel, so I could provide those to the Court

18   if the Court wishes to see them.

19           THE COURT:  All right.  It's always helpful to get

20   these things beforehand, not when I'm trying to do the

21   sentence.

22           MS. JEFFRESS:  I do apologize for that,

23   Your Honor.  I don't think that they're going to add that

24   much value because they are in Hebrew.

25           THE COURT:  They certainly are.

1           MS. JEFFRESS:  Mr. Segev has just interpreted

2   them, and what they show, really, are his payments from the

3   subcontractor for the last two years.  If that's an

4   important point, I can go into more detail.

5           THE COURT:  Well, it would be helpful to know

6   because, as I recall for the financial, he wasn't very

7   specific about how much he made.

8           MS. JEFFRESS:  The payments are actually on there,

9   but they're in shekels.  I think the ratio is about 1 to 7;

10  is that correct?

11          3.5.  Oh, okay.  I have it wrong by half.  So 3.5

12  shekels to the dollar.  So he was making a very average, if

13  you will, salary working for this cleaning company in

14  Israel.  And we didn't have these paystubs in time to

15  provide them to the probation officer, but we also noted in

16  the presentence report that the probation officer did not

17  take issue with the fact that he had this job and was

18  earning minimal salary at the cleaning company.

19          Your Honor, we would also object to the

20  Government's mentioning the fact of retained counsel as

21  something that this Court should consider in assessing his

22  ability to pay.  I don't know that this is an issue for the

23  Court because --

24          THE COURT:  It's not.  I would just simply say, to

25  move it along, that I'm going to find he doesn't have the

financial ability to pay a fine.  He's been locked up for a

year.  He has a $50,000 forfeiture, a money judgment against

him, so I don't see his having the ability to pay a fine on

top of that.

MS. JEFFRESS:  That's correct, Your Honor.  We

appreciate that.

In concluding, then, Your Honor, we have been

working with Mr. Nazarov for the months that he has been

here.  He is very sorry, and he will address the Court.

He's very sorry for what he did here.

Despite the language barriers, we have gotten to

know him personally.  We've had many meetings, again,

assisted by interpreters, and we appreciate their help.  I

did manage one meeting by myself in order to get him to sign

the acknowledgment of the presentence report, and we were

able to communicate because he has learned enough English to

understand that one meeting.  But other than that, we have

always had the assistance of the interpreters.

This whole episode, Your Honor, has been very

difficult for him.  As I mentioned before, the pain of being

apart from his family, and particularly his ailing parents,

has been very difficult.

We would just say that given the hardship he has

suffered, we would ask that the Court give him the most

lenient sentence that the Court finds is possible given the

1   Court's calculation of the guidelines, and if a departure is

2   available, because he will spend some time in the process of

3   being transferred to Israel, we would ask the Court to take

4   that into account.

5           Our understanding is that it takes some time to

6   process the transfer request.  He may have to be designated

7   through the Bureau of Prisons in order to get placed in a

8   facility that can process the transfer request.  That will

9   take some time.  So the sentencing range, Your Honor, in

10  this case is actually low enough that it may be that, by the

11  time he gets back to Israel, there isn't a lot more time

12  that he would have to serve.  In any event, we would ask

13  that the Court impose the lowest possible sentence.  We, of

14  course, are asking for 12 months and a day, which was

15  available under the prior range.  We would ask that the

16  Court, if the Court finds the range to be 18 to 24 months,

17  that the Court has the ability to go below it because of the

18  unusual circumstances of this case and the fact that he is

19  being transferred back to Israel, that the Court impose a

20  sentence of 15 months at the maximum, if that's possible.

21          THE COURT:  All right.  I understand Mr. Nazarov

22  wants to speak.

23          If you do, if you come up.

24          THE DEFENDANT:  I would like to say that I want to

25  beg your pardon that I happen to land in such a situation.

1   It will never repeat.  My goal is to come back as soon as

2   possible to my family and my parents.  My mother is gravely

3   ill.

4            This is all what I wanted to say.  Thank you for

5   your attention.

6            MS. JEFFRESS:  Thank you, Your Honor.

7            THE COURT:  Okay.  All right.  In addition to the

8   advisory sentencing guidelines, the Court considers the

9   pleadings, the arguments, the record in this case, in

10  addition to the following information in determining a fair,

11  appropriate, and reasonable sentence in conformance with the

12  factors in 18 U.S.C. 3553(a).

13           He is 46, but he's going to be 47 in a few days.

14  Criminal history, he has none here.  He's got the one

15  conviction in Israel in 2005 which I mentioned.

16           In terms of education, he's a high school

17  graduate.  He did attend college in Russia at the State

18  Institute of Economics and then withdrew when he emigrated

19  to Israel.

20           He has no professional licenses.  He did serve two

21  years in the Russian Army building roads.

22           In terms of employment history, from 2012 to 2017

23  when he was arrested, he worked for a commercial cleaning

24  company.  And from '92 to 2012, he worked as a laborer.

25           In Russia in college from '91 to '92, he worked in

1    various restaurants prior to being in the Russian Army.

2           Financial condition.  One bank account, unknown

3    balance.  He's been locked up.  He's going to be deported.

4    He does have a $50,000 forfeiture money judgment, so I'll

5    find there's no financial ability to pay a fine.  He does at

6    some point have to pay the $100.  I can't waive that.

7           In terms of substance abuse, mental health,

8    emotional, no issues.

9           Physical condition, no serious issues.  He's

10   taking a few medications, but he doesn't seem to have what I

11   would consider a medical condition that would rise to the

12   level of having to be considered.

13          On a personal basis, he was born in Russia to an

14   intact union.  His family emigrated to Israel in 1986, and

15   the defendant joined them.  His father works in the meat

16   department in a supermarket.  Formerly he was a high-level

17   pastry chef presumably in Russia.  His mother is a former

18   kindergarten teacher and in the hospitality industry, again,

19   presumably in Russia.  She, at this point, is in declining

20   health, is in treatment for cancer.  Mr. Nazarov has

21   described his relationship with his parents, and I'll quote

22   it, as "beautiful."

23          He has two siblings:  A brother, who is a

24   construction worker; a sister who is a pastry chef.

25          He's married.  He has seven children.  They're all

living at home.  Children range from 24 to 2 years old.  All
students of some sort.  Some are working at the same time.
His wife is a cleaning specialist.  He lives in a house that
he and his wife owned.  As indicated, he is deportable.

In terms of the offense conduct -- and this is in
very summary form -- it involves one transaction.
Mr. Nazarov formed a partnership with we'll call witness 1
in 2013 to share in proceeds from various fraudulent
schemes.  Witness 1 was involved in a business email
compromised scheme.  A bank account was needed to receive
the fraudulent proceeds.  W1 knew an individual in the
United States, W2, who provided a bank account in the United
States to receive the fraudulent proceeds.  They were wire
transferred from the company being defrauded 1.4 million,
plus W1 traveled from Israel to the United States, met with
W2 to decide how to split the proceeds including a share for
the defendant.

I would note that W1 was arrested when he came to
the United States and became an FBI informant.

The defendant protected W1 from an Israeli crime
family who was owed money for the 1.4 million, which W1 had
withdrawn and allegedly given to someone to launder, taken
the money.  It was a story the FBI concocted.  The crime
family was demanding their share.  The story, as I said, was
developed by the FBI in terms of what happened to the money.

1        W1 traveled to Israel and indicated that $50,000

2   would be paid to the defendant.  The defendant was concerned

3   whether it would come from a legitimate source or not.  He

4   agreed in his plea agreement and in the statement of offense

5   that he knew that the money was not from a legitimate

6   source, that it was unlawful proceeds.

7        Ultimately, the defendant gave W1 a name and a

8   contact for a person in Moscow who had a bank account -- or

9   opened a bank account in the name of a non-Russian wife with

10  the idea that it was unlikely that Russia would check on a

11  noncitizen.

12       There was a wire transfer.  It went through other

13  countries.  It was deposited in an account in Russia.  The

14  money going to Russia was falsely listed as intended for,

15  quote, a financial help, unquote, which was not true.  The

16  50,000 was wire transferred.  The person in Russia withdrew

17  the money, sent a photo to the defendant, and the money

18  ultimately came to the defendant through an informal hawala

19  network.

20       He did receive various letters of support.  He's

21  very clearly close to his family.  They miss him in their

22  daily life.  His parents both seem to be ill.  His mother

23  has cancer and his father has Parkinson's.  He evidently is

24  the manager of the municipality, I assume in his position

25  like a mayor.  He praised the defendant for his

1    contributions to the community, the town or city where

2    Mr. Nazarov lives.  The defendant obviously is a member of a

3    very close-knit family.

4         I will say this.  The defendant engaged in the

5    criminal conduct.  And as with all defendants who have

6    families, it affects not only their life but those that are

7    around them, and it's one of the consequences of engaging in

8    this type of action, and I wish that the defendants would

9    think about this before they engage in the criminal actions

10   because there obviously are consequences to the rest of his

11   family by doing this in terms of their being deprived of his

12   presence and his guidance, but it's actions that he took,

13   and this is, unfortunately, one of the consequences.

14        On the positive side, the defendant did agree to

15   be extradited to the United States to resolve the charges.

16   He waived the detention hearing.  He pled guilty as soon as

17   possible.  He saved the prosecution resources as well as

18   judicial resources.  He certainly is to be commended for

19   those actions.

20        I will say that money laundering is a serious

21   crime.  Fraudulent schemes wouldn't be successful, frankly,

22   if the criminals couldn't get access to the funds they

23   stole.  So money laundering is the key feature to any

24   fraudulent or illegal scheme to be successful, particularly

25   in the context of fraud, but it can be for other illegal

activities again.  It aids the commission of the crime.  It also hides the criminal proceeds or makes them appear legitimate, and usually illegal proceeds go through various accounts or other means, it was the hawala system or something else, to eventually reach without detection those involved in the scheme, which is the whole purpose of it.

In materials of the money laundering, Mr. Nazarov did know W1.  He knew W1 was involved in fraudulent schemes. He also was somewhat of a professional.  So the money he got would not be lawful, and he agreed that he knew the proceeds were not legal.  He evidently had connections in Russia where someone was willing to open an account, again, falsely stating the reason for the money being transferred putting it in the name of a wife who was non-Russian, again, in order to make it less likely it would be detected.

As I state in my order, I'm not going to go through and repeat the sophisticated laundering scheme used. It requires going through various discussions, but I did set it out.

The defendant's role in the money laundering, he was paid to provide the bank accounts where the money could be deposited, and he basically paid for services as a money launderer.

Now, the arbiter obviously was somewhat of a key role, but I don't think it has anything to do with the money

laundering.   In terms of the services he was paid for, the 50,000 was for the money laundering, not for being an arbiter.

He does have one conviction in Israel.   Based on the sentence, it would appear that the Israeli court did not consider it a major offense.

The defendant -- and there's been an explanation today -- it was a little vague about his finances.   I was a little surprised he wouldn't know how much money would be at least in the bank when he looked last.   Now, granted, he's been gone for almost a year.

The underlying scheme, which he was not included in, certainly was facilitated by his actions.   So in terms of looking at the factors under 3553(a), it is a serious offense as I've summarized.

Deterrence to him.   This is a lucrative business. He only has one conviction, but $50,000 does sound like more than what I assume he actually makes and would be a fair amount of money, but I do think he seems sincere in not wanting to be locked up again and away from his family, and that he would be unlikely to get involved in something that put him in this position once again.

Deterrence to other I think is a different issue. I think that's a key one.   You can't launch this illegal money.   It makes it being involved in the fraudulent scheme

more difficult, if not impossible, if you can't launder it;

in other words, especially for a fraudulent scheme that he's

not involved with but W1 was involved with to some degree

and where the funds came from.  Without that, the money

can't move around.  They would not have been able to, you

know, assuming that W1 had not been arrested, the money at

one point forward would've gone into an account and in all

likelihood would've disappeared through other accounts.  So

there is an issue of deterrence to others, and, obviously,

punishment has to be sufficient to accomplish the goals that

have been set out as a factor.

          I think in terms of considering it, I think in

this particular instance where he has not lived in this

community would not be benefiting, frankly, from releasing

him to the community.  So I don't think really the Smith

departure is applicable.  You agreed not to have any, but I

don't think it really works in the purpose of doing it, and

I don't think that there's a basis for a variance.

          I do think he should get credit for time served

since he got locked up, and I think this was -- locked up in

Israel on his way here, so he should get credit for time

served since March 1st, and I've indicated no supervised

release.

          So under those circumstances, it's the judgment of

the Court that you, Stanislav Nazarov, are hereby committed

to the custody of the Bureau of Prisons for a term of 18

months.  You also are ordered to pay $100 special

assessment.  You will get credit for time served from

March 1st, 2017, when you first got arrested on the

extradition in Israel.  I'll find that you don't have an

ability to pay a fine and waive the imposition of a fine in

this case.  It is immediately payable.  This is something

that can be paid over time.

The probation office shall release the presentence

investigation report, enter judgment and commitment order to

the Bureau of Immigration and Customs Enforcement to

facilitate any deportation proceedings.

I would put it in here -- because he actually

wants to go back to Israel -- the probation officer shall

release the presentence investigation report to all

appropriate agencies in order to execute the sentence of the

Court.  They're pursuant to Rule 32.2(a) of the Federal

Rules of Criminal Procedure.  You are ordered to forfeit a

money judgment in the amount of $50,000, and I have signed

that particular order.

In terms of appeal, pursuant to the statute, you

have a right to appeal the sentence imposed by the Court.

If the period of imprisonment is longer than the statutory

maximum, which it's not, or it departs upward.  If you

chooses to appeal, and you still have your constitutional

1    rights to do so, you must file any appeal within 14 days

2    after the Court enters judgment.

3              Let me double-check on something on this.

4              Okay.  So there was a waiver of the appeal, which

5    is what I thought.

6              In terms of the 2255, you have a right to

7    challenge the conviction entered or sentence imposed if new

8    and currently unavailable information becomes available to

9    you, or on a claim that you received ineffective assistance

10   of counsel in entering a plea of guilty to the offense of

11   conviction or in connection with the sentencing.  If you are

12   unable to afford the cost of an appeal, you can request

13   permission from the Court to file it without cost to you,

14   and you can also request counsel to represent you without

15   cost to you as well.

16             You should have a discussion with counsel because

17   she can, at the minimum, note an appeal even if you get into

18   this at a later point.

19             The final notice, which I'm required to set out,

20   is pursuant to the D.C. circuit opinion United States vs.

21   Hunter.

22             Are there any objections to the sentence imposed

23   that I have not already noted on the record?  Is there

24   anything else I should be aware of?

25             MR. MARANDO:  Nothing from the Government, Your

1      Honor.

2                  THE COURT:  Okay.

3                  Ms. Jeffress, anything from you?

4                  MS. JEFFRESS:  Your Honor, I would just note that

5      we did waive the right to appeal as part of the plea

6      agreement.  And I do understand the Court's advice here, but

7      we want to make clear for the record that he will not be

8      appealing the sentence because it may --

9                  THE COURT:  Okay.  I separated out the

10     constitutional, so I leave it to you to decide what the

11     claims would be, if any.

12                 MS. JEFFRESS:  I appreciate it, Your Honor.  I

13     just want it on the record because it may affect whether

14     there has to be a 14-day period before the transfer

15     proceedings can begin.  So we wanted to make clear that as

16     of today, he will not be appealing the Court's decision in

17     the case.

18                 THE COURT:  All right.  My suggestion is that you

19     contact -- and I'm sure that you will -- contact the Bureau

20     of Prisons as to how they are going to orchestrate this.

21     They do have offices that have this, and I have found that,

22     generally, their legal counsel is fairly cooperative in

23     terms of moving things along, paperwork included.

24                 All right.  Good luck, Mr. Nazarov, and I do not

25     expect to ever see you back here unless you come for a

1   vacation but not otherwise.

2             MR. MARANDO:  One more thing, Your Honor.  The

3   Government moves to dismiss the remaining counts in the

4   indictment, Counts 2 and 3.

5             THE COURT:  All right.  So dismissed.

6             The parties are excused.

7        (Hearing concluded.)

CERTIFICATE OF REPORTER

I, Richard D. Ehrlich, a Registered Merit Reporter and Certified Realtime Reporter, certify that the foregoing is a true, complete, and accurate transcript of the proceedings ordered to be transcribed in the above-entitled case before the Honorable Colleen Kollar-Kotelly, in Washington, D.C., on March 5, 2018.

s/Richard D. Ehrlich  March 19, 2018
_____
Richard D. Ehrlich, Official Court Reporter